125 P.3d 180 (2005)
In re the Marriage of Joyce SHUI, Appellant/Cross-Respondent, and
Shawn ROSE, Respondent/Cross-Appellant.
No. 54539-6-I.
Court of Appeals of Washington, Division One.
December 19, 2005.
*182 Philip A. Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Appellant.
Sherri M. Anderson, Law Offices of Sherri M. Anderson, PLLC, Seattle, WA, Shelby R. Frost Lemmel, Charles K. Wiggins, Wiggins & Masters PLLC, Bainbridge Island, WA, for Respondent.
GROSSE, J.
¶ 1 During a marriage, when a spouse exercises stock options having a mixed character as both separate and community property, deposits the proceeds of the exercise into a single account then disburses those proceeds into four different investment accounts, so that it is impossible to trace the residual amounts contained in the accounts to the options from whence they came, the proceeds in the investment accounts are, by law, entirely community property. Because the trial court in this case failed to classify the proceeds contained in the four investment accounts as entirely community property, and that classification was crucial to the property distribution, we reverse and remand.

FACTS
¶ 2 Shawn Rose was hired by Microsoft in 1991 as a financial analyst. As part of his compensation package he was granted options to purchase shares of Microsoft stock. In July of 1993 and 1994, coinciding with his annual performance reviews, Rose was granted additional options to purchase Microsoft stock. The options were not vested when granted, but instead vested over a period of time. Shawn Rose married Joyce Shui on September 3, 1994.
¶ 3 Subsequent to the marriage, Rose was granted additional stock options in July of 1995, 1996 and 1997. Rose exercised a portion of the 1991 grant in March 1993, prior to his marriage to Shui. He did not exercise the rest of the options available to him from the 1991, 1993, 1994, 1995, 1996, and 1997 grants until late 1998 and early 1999, in anticipation of his departure from Microsoft. Rose exercised the options and sold the stock, which yielded nearly 6.5 million dollars. Rose initially deposited the proceeds in a single investment account held in his name, then moved the proceeds to yet another investment account, before finally distributing the funds among four different investment accounts. Only one of the four accounts was held jointly by Rose and Shui. This account had a checking feature which the parties used to pay various expenses.
¶ 4 Shui filed the present dissolution action on October 28, 2002. After a bench trial, the trial court characterized the proceeds of the stock options contained in the four investment accounts as 61.073 percent Rose's separate property, based on the testimony of Rose's expert, Robert Duffy. The court then awarded Shui 75 percent of the couple's community property and allowed each party to keep all of their own separate property. The trial court also determined Shui to be the primary residential parent of the couple's two children, imputed income on both parents for child support purposes, and initially required Rose to pay $481 in child support. The trial court increased Rose's child support payment to $1,200 on reconsideration. The parties also were required to pay their own attorney fees.
*183 ¶ 5 After motions for reconsideration were filed and ruled on by the trial court, Shui filed this appeal and Rose filed a cross-appeal. Shui appeals the trial court's classification and division of the stock option proceeds contained in the four investment accounts, the trial court's imputation of income and child support determinations, and the trial court's decision on attorney fees. She also requests attorney fees on appeal. Rose cross-appeals the residential placement of the children.

ANALYSIS

Property Classification and Distribution
¶ 6 The seminal decision on the classification of stock options for purposes of property division in a marriage dissolution action is In re the Marriage of Short.[1] While Short concerned stock options that were granted to a spouse during marriage and vested over a period of time before, during and after the spouses were found to have been living separate and apart, the present case involves proceeds from stock options that were granted prior to marriage and whose segments vested over a period of time before, during and after the spouses became married. At issue here is whether the rules announced in Short apply equally under the circumstances of this case and therefore, whether the trial court erred in adopting a methodology that deviated from Short. Because the rules set forth in Short are consistent with the presumption in Washington that assets acquired during marriage are community property, we believe those rules are equally applicable to the case at bar and the trial court erred in not following Short.

In re the Marriage of Short
¶ 7 In classifying the stock options at issue in Short, the court first emphasized the importance of differentiating between stock options that are vested when granted and those that are unvested:
The characterization of employee stock options as separate property or community property under RCW 26.16 depends upon when the employee stock options were acquired. A vested employee stock option is acquired when granted. An unvested employee stock option is not so easily characterized and requires a more complex analysis. An unvested employee stock option is one that provides no legal title or rights of absolute ownership over the stock option to the employee.[2]
The court then went on to explain how unvested stock options are characterized:
To determine how unvested employee stock options are characterized under RCW 26.16, a trial court must first ascertain whether the stock options were granted to compensate the employee for past, present, or future employment services. This involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options. Unvested employee stock options granted during marriage for present employment services, assuming the parties were not "living separate and apart" under RCW 26.16.140 when the stock options were granted, are acquired when granted. Unvested employee stock options granted for future employment services are acquired over time as the stock options vest.[3]
For unvested stock options granted for future services, the court employed the time rule to the first option to vest after the parties are found to be living separate and apart. The court explained that the time rule,
is nothing more than a fraction whose numerator is the period of time between the commencement of the spouse's employment by the employer granting the stock options and the date the parties were found to be "living separate and apart," and the denominator is the period of time between commencement of employment and the date when each option is first *184 exercisable, multiplied by the number of shares which can be purchased on the date the option is first exercisable.[4]
The court also noted that, "[t]he characterization of stock options according to the `time rule' is not inflexible and may be modified depending upon the particular facts of a case, including the different purposes served by granting employee stock options."[5]
¶ 8 Moreover, the court specifically announced that the time rule should apply only to the first option to vest after the parties are found to be living separate and apart. The court explained:
After determining whether employee stock options were granted to compensate the employee for past, present, or future employment services, the "time rule" is applied. For future employment services, the "time rule" is applied to the first stock option to vest after the parties are found to be "living separate and apart." This is the lone stock option that includes both a community effort and a separate effort. We do not apply the "time rule" to every stock option that vests after the parties are found to be "living separate and apart" because to do so ignores the separate property provisions of RCW 26.16. Multiple stock options granted for future services vest consecutively, not concurrently. Such a ruling insures that stock options are characterized and apportioned to reflect their marital and nonmarital aspects. This interpretation of the "time rule" differs from that announced in In re Marriage of Hug[.][6]
¶ 9 In sum, Short's analytical framework involves: (1) determining whether the options were vested or unvested when granted; (2) for unvested options, determining the purposes for which the options were granted (for past, present or future services); and (3) for unvested options for future services, determining the period of time during which the option segment vested, keeping in mind that the option segments vest consecutively, not concurrently.

The Trial Court's Analysis versus Short
¶ 10 In the present case, the assets before the trial court were the proceeds from the exercise of stock options and the sale of stock. All of the options were unvested when granted. In an effort to classify the proceeds for the trial court, Rose's expert, Robert Duffy, first classified the options themselves. The trial court adopted Duffy's analysis for purposes of property classification.
¶ 11 Rose began working at Microsoft in 1991 and was granted stock options in 1991, 1993, 1994, 1995, 1996 and 1997. Only the classification of the 1991, 1993 and 1994 options were contested at trial.[7] The 1991 options were granted under the 1981 Microsoft Stock Option Plan and the 1993 and 1994 options were granted under the 1991 Microsoft Stock Option Plan.
¶ 12 Employing Short's analytical framework, the first question is whether the options were vested or unvested when granted. As indicated by the following vesting schedules, the options were unvested when granted:[8]

--------------------------------------------------------------------
 1991 Grant (9/16/91) 1993 Grant (7/30/93) 1994 Grant (7/21/94)
--------------------------------------------------------------------
 Portion Portion Portion
 Date Vested Vested Date Vested Vested Date Vested Vested
--------------------------------------------------------------------
 3/16/93 1/4 1/30/95 1/4 7/21/95 1/8
--------------------------------------------------------------------
 9/16/93 1/8 7/30/95 1/8 1/21/96 1/8

*185
--------------------------------------------------------------------
 3/16/94 1/8 1/30/96 1/8 7/21/96 1/8
--------------------------------------------------------------------
 9/16/94 1/8 7/30/96 1/8 1/21/97 1/8
--------------------------------------------------------------------
 3/16/95 1/8 1/30/97 1/8 7/21/97 1/8
--------------------------------------------------------------------
 9/16/95 1/8 7/30/97 1/8 1/21/98 1/8
--------------------------------------------------------------------
 3/16/95 1/8 1/30/98 1/8 7/21/98 1/8
 -------------------
 1/21/99 1/8
--------------------------------------------------------------------

¶ 13 The next question is whether the unvested options "were granted to compensate the employee for past, present, or future employment services."[9] Since all three of the grants at issue were made before Rose married Shui, if any of the grants or portions of the grants are found to have been made for past or present services rendered by Rose, they were acquired by Rose when granted and are his separate property.[10]
¶ 14 Duffy determined that 50 percent of the 1991 grant was an inducement to Rose made as part of his offer of employment. Specifically, he based his determination on the language of the Microsoft Corporation 1981 Stock Option Plan stating that part of the purpose for the plan was "to attract" personnel,[11] his research indicating that Rose's salary was below market and that the options were granted to "sweeten the pot" to allow him to accept a below market salary,[12] and that the options were frontloaded with more shares vesting early on.
¶ 15 As stated in Short, the determination of whether the options were granted to compensate the employee for past, present or future employment services "involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options."[13] Such findings will not be disturbed when they are supported by substantial evidence.[14] The trial court's determination that 50 percent of the 1991 grant was for present services, that is, an inducement for Rose to come work for Microsoft, is supported by Duffy's expert testimony citing the language of the Microsoft Corporation 1981 Stock Option Plan, his research on Rose's salary and Microsoft's hiring practices, and the frontloading of the stock. Substantial evidence exists to support the trial court's findings on this issue.
¶ 16 Likewise, substantial evidence exists to support the trial court's determination that the 1993 and 1994 grants were 50 percent for past services and 50 percent for future services. Here again, the trial court adopted Duffy's analysis. In coming to his conclusion, Duffy observed that the granting of stock options coincided with Rose's performance reviews and that the letters accompanying those reviews stated, in the case of the 1993 grant, "To further acknowledge your contributions, we would like to award you a bonus of $1,000 along with 1,000 shares of stock options." And in the case of the 1994 grant, the review letter stated, "To further acknowledge your contributions, you have been awarded a bonus of $3,200 along with 3,200 shares of stock options." Duffy reasoned that such language seemed to imply that some of the options were awarded for something Rose did in the past. Duffy also observed that the amount of shares awarded corresponded with the performance rating he *186 received, with Rose being granted more shares in 1994 when his performance rating was 4.0 than in 1993 when his rating was 3.0. Duffy also corresponded with Rose's former manager to determine why the shares were granted.
¶ 17 Duffy balanced this evidence that the options were for past performance with other evidence that seemed to indicate that the grants were for future services. Specifically, he acknowledged another letter from Microsoft accompanying his 1994 review which states, "As you know, the Company has granted you this option based on your expected future contributions to the Company's growth and success." In the end, Duffy came to conclusion that the options were 50 percent for past services and 50 percent for future services, and the trial court adopted Duffy's determination. Duffy's expert testimony is substantial evidence in the record to support the trial court's findings, and we will not disturb those findings.
¶ 18 Beyond this, Duffy's analysis is erroneous in two respects. First, he misapplied the time rule announced in Short to the unvested options designated for future services. Second, his application of the overall percentage of separate shares versus community shares onto the proceeds in the investment accounts ignored the differing value the options had when they were exercised.
¶ 19 As for the time rule issue, the Short court specifically stated that the time rule applies only to the first option segment to vest after the parties are found to be living separate and apart.[15] It further explained that "[m]ultiple stock options granted for future services vest consecutively, not concurrently."[16] The trial court explained that this rule was necessary to honor the "separate property provisions of RCW 26.16."[17]
¶ 20 In the present case, the Short rule is necessary to honor the community property provisions of RCW 26.16. Specifically, the rule is consistent with the presumption in Washington that assets acquired during marriage are community property.[18] Just as applying the time rule in Short only to the first option to vest after dissolution was necessary to protect Robert Short's separate property interest in those options that vested completely after his marriage had ended, applying the same rule in this case is necessary to protect the marital community's interest in options that vested completely during the marriage. In this case, therefore, the time rule should only apply to the first segment of an option to vest after the parties are married.
¶ 21 Duffy departed from the Short rule and instead applied the time rule to every segment of the three options that vested after the parties were married, not just the first segments to vest.[19] If Short was followed faithfully, the time rule should only have been applied to the first segments of each of the 1991, 1993, and 1994 grants to vest after the parties were married, and the portions of the subsequent segments granted for future services would be entirely community property. Since the parties were married on September 3, 1994,[20] the time rule would apply to the fourth segment to vest under the 1991 grant and the first segments to grant under the 1993 and 1994 grants, because under the Short rule, these are the only segments that contain both community effort and a separate effort.[21] The subsequent *187 segments containing an award for future services which vested entirely during the marriage are community property. In this case, 50 percent of each subsequent segment is therefore community property.
¶ 22 Aside from the misapplication of the time rule, Duffy's analysis also is deficient because his application of the overall percentage of separate shares versus community shares onto the proceeds in the investment accounts ignores the differing value the options had when they were exercised. In other words, some of the options were much more valuable than the others, depending on both their strike price (the price at which Rose was allowed to purchase the stock) and the price of the stock when Rose sold it. For example, the strike price of the 1991 grant was $3.4583 per share, while the strike price of the 1997 grant was $31.2344 per share. Furthermore, Rose sold the Microsoft stock at different times, when the price of the stock was anywhere from $59.58 per share to $80.78 per share. Duffy's analysis treats the shares equally and does not take into consideration their differing value in terms of real dollars, and it is the classification and division of the real dollar proceeds that was before the trial court.
¶ 23 In sum, Duffy's analysis impermissibly deviated from the rules set forth in Short and is inconsistent with the presumption in Washington that assets acquired during marriage are community property, and the trial court erred in adopting it.

Commingling
¶ 24 Rose exercised most of his stock options between November 1998 and April 1999, in anticipation of his departure from Microsoft. As discussed above, some of these options had a mixed character, some were entirely community property, and some were entirely separate property. Upon exercising the options, Rose sold the stock and placed the cash proceeds in a single investment account. He then moved the proceeds to another investment account, before finally distributing the proceeds into four different investment accounts.[22] It is undisputed that the money in these four investment accounts comes entirely from the proceeds of the stock options and that no other money has been added to these accounts. Only one of these accounts was held jointly with Shui. Some of the proceeds contained in these accounts were used to purchase and contribute to the maintenance of the family home, to purchase cars, and to purchase household furnishings, including a piano. All of this activity occurred before the couple was found to be living separate and apart.
¶ 25 Shui argues that the proceeds, containing a substantial amount of community and separate property, have become so intermixed that it is impossible to ascertain what portion of the proceeds remaining in the investment accounts is Rose's separate property and what portion is community property.
¶ 26 Our Supreme Court has recently reiterated:
Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable; however, if the property becomes so commingled that it is impossible to distinguish or apportion it, then the *188 entire amount becomes community property. As this court has explained before:
"`[T]he right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character until some direct and positive evidence to the contrary is made to appear.'"
The burden is on the spouse claiming separate funds to clearly and convincingly trace them to a separate source.[23]
Furthermore, commingling occurs when:
(1) a substantial amount of separate property is (2) intermixed with (3) a substantial amount of community property to the extent that (4) it is no longer possible to identify whether the remainder is the separate property portion or the community property portion. When commingling has occurred, all of the asset becomes community property, and any asset acquired from the commingled asset is community property.[24]
¶ 27 Rose's effort to trace the proceeds consisted of determining a cumulative percentage of the stock option shares that were separate in character versus community in character and applying that percentage to the residual balances of the four investment accounts. For the reasons stated above, the methodology used to arrive at the cumulative percentage was erroneous, but just as importantly, his application of the percentage onto the balances in the investment accounts was not a proper tracing.
¶ 28 Rose's effort was not a proper tracing because it failed to take into consideration the fact that the exercise of each option segment yielded different amounts of cash depending on the strike price and the price of the stock when Rose sold it. Furthermore, while it may have been possible at one time using the correct methodology to determine the exact dollar amounts of separate and community property yielded by the sale of the stock, the funds have since been mixed together and then dispersed to four different investment accounts, and have been used to purchase a variety of investments which have yielded different rates of return; all of this happening during the marriage.
¶ 29 Given these circumstances, absent some evidence that Rose had carefully designated certain investments to correspond with the individual option segments exercised, the funds in the investment accounts simply are not traceable to the options that yielded them. There is no such evidence in the record that Rose engaged in such activity. In fact, Rose testified at trial that he did not have any thought process related to separate versus community property at all when he exercised the options and invested the proceeds.
¶ 30 Furthermore, Shui's expert, William L. Hawes, testified that tracing was impossible in this case. He stated, "the only thing you could do is to, say, select one [investment] account that a million dollars went into and look at it today and say it is now worth half a million. But you can't take that half million back and say, oh, yes, that half a million is the residual of the exercise of the third grant of the fourth option, or whatever. You can't do that."
¶ 31 It is worth noting that the commingling problem presented in this case was not completely ignored by the trial court, even though it failed to apply the commingling rule consistently throughout its decision. In its findings of fact the trial court stated:
Some of the proceeds from the accounts containing funds from [the] exercise of the Microsoft stock options were used to purchase and contribute to the maintenance of the family home, to purchase cars, and to purchase household furnishings, including a piano. The husband did not prove the identity of the funds for such purposes as separate, and to the extent such funds were in part separate property, their use for family purposes are considered a gift to the community.
*189 The trial court's reasoning is equally applicable to the investments purchased with the stock option proceeds as it is for the cars and the piano. Rose failed to prove the identity of the funds used to purchase the various investments contained in the four accounts and thus the proceeds in the four accounts are entirely community property.
¶ 32 In sum, because Rose failed to fulfill his burden to trace and thereby identify the proceeds contained in the four investment accounts as his separate property, and because the proceeds in the investment accounts containing substantial amounts of both separate property and community property have become so intermixed that it is no longer possible to determine whether the remainder is separate or community in character, the assets contained in the four investment accounts are, by law, entirely community property.

Property Distribution
¶ 33 We need not remand the distribution issue to the trial court unless "(1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way."[25] In this case, the trial court's division of property was predicated on the classification of the parties' assets. After listing what it classified as community property and separate property the trial court determined that Shui should receive 75 percent of the parties' community property and Rose should receive 25 percent, and that each party should be awarded his or her separate property.[26] Moreover, the record does not clearly indicate that the trial court would have distributed the property in the same way regardless of the characterization of the stock option proceeds. The trial court's conclusions of law merely state, "The distribution of property and liabilities as set forth in the decree is fair and equitable." It does not specifically state that it would have made the same decision regardless of the classification.[27] Since the classification of the stock option proceeds in the investment accounts was crucial to the distribution, we must remand so the trial court may exercise its discretion with the correct character of the property in mind.
¶ 34 In conclusion, the methodology adopted by the trial court to classify the disputed stock options was erroneous. The trial court then compounded this error by failing to recognize that the proceeds derived from the stock options were commingled to an extent that is no longer possible to trace the remaining proceeds contained in the four investment accounts to a separate or community source with any particularity. The proceeds contained in the investment accounts are thus entirely community property and we remand this case to the trial court for reconsideration of the distribution of assets.

Imputed Income and Child Support
¶ 35 A trial court's award of child support, including imputation of income for a voluntarily unemployed or underemployed parent, is reviewed for an abuse of discretion.[28] Whether a parent is voluntarily underemployed *190 depends on the parent's work history, education, health, age, and other relevant factors.[29] When calculating child support obligations, "a court may consider all relevant factors, including current and future income."[30]
¶ 36 It is uncontested that at the time of trial Rose was voluntarily unemployed and Shui was voluntarily underemployed as a part-time school teacher. Shui claims the trial court abused its discretion by imputing $16,667 per month gross income to Shui based solely on her most recent fulltime employment as general counsel for a start-up information technology consulting company at the height of the technology boom. She also claims that the trial court erred by not taking into consideration Rose's significant assets when determining the child support award.
¶ 37 We find that the trial court's imputation of $16,667 per month gross income to Shui to be an abuse of discretion because all the evidence presented below indicated that the market conditions upon which her position and salary were based had ceased to exist. Shui's general counsel position was eliminated in October 2002. Legal recruiter Victoria Harris testified at trial that the recent technology boom allowed many young lawyers like Shui to make a "meteoric rise" and become general counsel "without having had the ten-plus years' experience that it usually takes to become a general counsel." Harris also testified that general counsel opportunities for persons with Shui's experience did not exist at the time of the trial. In her report and testimony she concluded, "In my opinion a 1993 law school graduate earns an average base salary of $125,000 as an in-house attorney" and that Shui might be able to earn a little more than that if she found the right position. Based on this undisputed testimony we find the trial court abused its discretion in imputing income to Shui based solely on a position that was no longer available in the marketplace for a person with her credentials.[31]
¶ 38 Shui's contention that the trial court did not take into consideration Rose's significant wealth in calculating child support is without merit because on Shui's motion for reconsideration, the trial court nearly tripled its original child support award, citing Rose's significantly greater assets as one of the reasons for setting child support higher than the standard amount. However, since the trial court determined child support based in part on the relative wealth of the parties, we also find it appropriate to remand the child support issue based on the possibility that the parties' relative wealth might change upon a redistribution of assets on remand.

Attorney Fees
¶ 39 Shui asks that this court find the trial court abused its discretion in not awarding her attorney fees at trial. She also argues that she is entitled to attorney fees on appeal. The trial court found that each party had the ability to pay his or her own attorney fees. A fee award in a dissolution case must balance the requesting party's needs against the other party's ability to pay.[32] In light of the substantial assets of both parties to this litigation, the trial court did not abuse its discretion in ordering each party to pay his or her own fees; nor is an award of appellate fees warranted in this case.[33]

Residential Placement (Cross-Appeal)
¶ 40 Rose cross-appeals the trial court's decision designating Shui the primary residential parent for the couple's two young children. We review the trial court's rulings with regard to the placement of children for *191 abuse of discretion.[34] "The residential placement is to be in the best interests of the child and is to be made only after certain factors have been considered by the court."[35] These factors include:
(i) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
(iii) Each parent's past and potential for future performance of parenting functions;
(iv) The emotional needs and developmental level of the child;
(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.
Factor (i) shall be given the greatest weight.[36]
In reaching its decision the trial court stated in its findings of fact:
While both parents have many parenting qualities that are beneficial to the children, the mother is better suited to serve as the primary residential parent. This finding is based upon Ms. Waldroup's March 2003 evaluation and the testimony at trial as to the time the mother spends with the children engaged in activities involving other families and the like.
Margo Waldroup was appointed by the trial court to conduct a parenting plan evaluation in this case. Waldroup provided the court with a detailed 21 page report based on interviews with Shui and Rose; a home visit with Shui and the children; a home visit with Rose and the children; parent-child observations; interviews with references for both parties, the parties' therapists, nannies and housekeepers who had worked for the parties during their marriage, and a teacher from the children's preschool; the pleadings submitted by counsel for both parties; a review of each parent's evaluation information form and attached documents; and a review of the results of the psychological testing of Shui and Rose. Waldroup also testified at length during the trial. In the end, Waldroup recommended to the court that Shui be the children's primary residential parent, giving greatest weight to the "history of primary parenting and quality of parenting." While the trial court did not explicitly address every factor set forth in RCW 26.09.187(3)(a) in its findings of fact and conclusion of law, a review of Waldroup's report reveals that it encompasses the relevant factors; furthermore, it is evident that both Waldroup and the trial court gave the most weight to the first statutory factor, as is required by the statute. Waldroup's report, testimony, and ultimate recommendation taken together are substantial evidence in the record upon which the trial court based its decision.
¶ 41 More specifically, Rose argues that we should reverse the parenting plan because Shui resumed her law practice after the trial, thereby undermining the assumptions upon which the trial court relied in designating Shui the primary residential parent. Because we are not in a position to address evidence that was not before the trial court when it finalized the parenting plan, we will not address this issue.
¶ 42 For the above reasons, we reverse the trial court's order distributing the parties' assets and remand for reconsideration of their distribution. We reverse and remand the trial court's orders regarding Shui's imputed income and the child support award. *192 We affirm the trial court's orders addressing allocation of attorney fees and the residential placement of the children. Shui's request for appellate fees is denied.
WE CONCUR: ELLINGTON, A.C.J., and SCHINDLER, J.
NOTES
[1] In re Marriage of Short, 125 Wash.2d 865, 873, 890 P.2d 12 (1995).
[2] Short, 125 Wash.2d at 871, 890 P.2d 12 (citations omitted).
[3] Short, 125 Wash.2d at 873, 890 P.2d 12.
[4] Short, 125 Wash.2d at 872, 890 P.2d 12.
[5] Short, 125 Wash.2d at 872, 890 P.2d 12.
[6] Short, 125 Wash.2d at 874-75, 890 P.2d 12 (citing In re Marriage of Hug, 154 Cal.App.3d 780, 201 Cal.Rptr. 676, 46 A.L.R.4th 623 (1984)).
[7] Since the 1995, 1996, and 1997 grants were granted, vested, and exercised during their marriage, the parties do not contest that the proceeds derived from those options are entirely community property. The parties also do not dispute the separate quality of the proceeds derived from options exercised by Rose before the couple married.
[8] It is important to note that the options at issue allowed for a cashless exercise of the options, which is what happened here.
[9] Short, 125 Wash.2d at 873, 890 P.2d 12.
[10] See Short, 125 Wash.2d at 873, 890 P.2d 12.
[11] The 1981 Plan, as quoted here in Short, states:

The purpose of this Plan is to encourage ownership of Common Stock of the Company by officers and key employees of the Company and any current or future subsidiary. This Plan is intended to provide an incentive for maximum effort in the successful operation of the Company and is expected to benefit the shareholders by enabling the Company to attract and retain personnel of the best available talent through the opportunity to share, by the proprietary interests created by this Plan, in the increased value of the Company's shares to which such personnel have contributed.
Short, 125 Wash.2d at 868-69, 890 P.2d 12 (emphasis in original).
[12] Duffy cited correspondence he had received from a Microsoft executive who told Duffy that Rose was a "Grade A" job candidate, and that with such candidates "the pot was sweetened ... by adding more options to the offer."
[13] Short, 125 Wash.2d at 873, 890 P.2d 12.
[14] Short, 125 Wash.2d at 874, 890 P.2d 12.
[15] Short, 125 Wash.2d at 874, 890 P.2d 12.
[16] Short, 125 Wash.2d at 875, 890 P.2d 12.
[17] Short, 125 Wash.2d at 874-75, 890 P.2d 12.
[18] See RCW 26.16.030.
[19] Rose recognizes in his brief that Duffy's interpretation "creates an anomaly between stock options granted during marriage and vesting after, and those granted before marriage and vesting during marriage." He nevertheless argues that the circumstances of this case warrant a more flexible application of the time rule, namely the approach advocated by Duffy and adopted by the trial court. Because adopting Duffy's analysis and departing from Short's clear directive would ignore the community property presumption we must follow, the flexibility he advocates is impermissible.
[20] The marriage date is the appropriate date to use when applying the time rule because the trial court specifically found that the parties did not have a meretricious relationship prior to their marriage.
[21] The Short court explains that the time rule is measured from the date of the commencement of the spouse's employment. This made sense in Short, because the option at issue in Short was granted upon Robert Short's employment, and the first segment of the grant to vest was the segment that vested after Short and his wife separated. Using the date of employment does not work here because the 1993 and 1994 grants were made subsequent to Rose's commencement of employment, and the 1991 segment that vested after the marriage was the fourth segment in the 1991 grant. Instead, the date that the segment in question began to vest is the more appropriate starting point to use in applying the time rule here. Such an approach is necessary if Short's directive that the segments vest consecutively, rather than concurrently, is to be faithfully followed. See In re Marriage of Stachofsky, 90 Wash.App. 135, 951 P.2d 346 (1998) (where the court used the granting date and not the date of employment when the option at issue was granted subsequent to the spouse's employment and the first segment to vest after the parties were found to be living separate and apart was also the first segment to vest under the grant).
[22] These four accounts include a Quick & Reilly investment account, an Ameritrade investment account, a Harris Direct investment account, and a Vanguard investment account. They do not include the Vanguard retirement accounts which were dealt with separately by the trial court.
[23] In re Marriage of Chumbley, 150 Wash.2d 1, 5-6, 74 P.3d 129 (2003) (quoting In re Dewey's Estate, 13 Wash.2d 220, 226-27, 124 P.2d 805 (1942), emphasis in original, citations omitted).
[24] 19 Kenneth W. Weber, Washington Practice: Family and Community Property Law § 11.13, at 159-60.
[25] In re Marriage of Shannon, 55 Wash.App. 137, 142, 777 P.2d 8 (1989).
[26] After listing the couple's community and separate assets, the findings of fact state:

The wife should receive 75 [percent] of the parties' community property and the husband should receive 25 [percent]. This is equitable in light of the lifestyles the parties chose relying on the husband's more significant personal wealth. The parties essentially spent all of the wife's earnings during the marriage, including expenditures on such things as the very experience life insurance for the children, in reliance upon the husband's more substantial wealth. The wife would have made different spending decisions during high-earning years had the parties not relied on the joint assets of the parties, both community and separate, for their financial planning. A higher award of community property is not warranted, because she does have a higher earning capacity.
. . . .
Each party should be awarded his or her separate property.
[27] See In re Marriage of Stachofsky, 90 Wash. App. at 147, 951 P.2d 346 (remand unnecessary because trial court clearly indicated it would not have changed its 50/50 division of the stock even if it had been mischaracterized).
[28] In re Marriage of DewBerry v. George, 115 Wash.App. 351, 367-68, 62 P.3d 525 (2003).
[29] DewBerry, 115 Wash.App. at 367, 62 P.3d 525.
[30] In re Marriage of Payne, 82 Wash.App. 147, 152, 916 P.2d 968 (1996).
[31] Shui admits that she has resumed her legal career since the trial. As such, her current job and salary may be taken into consideration by the trial court on remand.
[32] In re Marriage of Rideout, 150 Wash.2d 337, 357-58, 77 P.3d 1174 (2003).
[33] We also deny Shui's motion to strike Rose's RAP 18.1 financial declaration.
[34] In re Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993).
[35] Kovacs, 121 Wash.2d at 801, 854 P.2d 629 (citing RCW 26.09.002 and RCW 26.09.187(3)).
[36] RCW 26.09.187(3)(a)