**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 82134-2-I |
| | ) | |
| TIM LEO MARTIN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| and | ) | |
| | ) | |
| MARINA V. JAMES, | ) | |
| | ) | UNPUBLISHED OPINION |
| Respondent. | ) | |
| | ) | |

MANN, J. — This is a dissolution action between Tim Martin and Marina James.

Tim appeals and argues that the trial court abused its discretion by: (1) awarding Marina

maintenance for three years, (2) failing to impute income to Marina because she is

voluntarily unemployed, (3) not including rental income in Marina's child support

calculation, (4) applying Illinois law to characterize the proceeds of the Chicago

property, and (5) finding Marina preserved a separate property interest in the Chicago

property.[1]  We affirm.

---

[1] Consistent with the parties' briefing and to avoid confusion, we refer to the parties by their first names.  We mean no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

## FACTS

A. Background

Marina and Tim met in 2008 in Columbia, South Carolina. Marina, who has an MBA, was an export manager at Transcon Trading. Tim was a graduate student in chemical engineering at the University of South Carolina. After Tim received his Ph.D, Marina quit her job and the two moved to Chicago March 2010. Soon after, Tim accepted a position as a chemical engineer for Caterpillar in Peoria, Illinois. In November 2010, the two traveled to their respective homes. Tim traveled to Azerbaijan and Marina traveled to Kazakhstan. They met in London on their way home where Tim's first act of domestic abuse occurred. The parties separated for a period of time.

The parties reconciled in January 2011. Shortly after purchasing a condominium together at 200 North Dearborn Street in Chicago, Tim and Marina were married on April 20, 2012, in Skokie, Illinois.

In 2013, Marina researched buying properties at auction to begin a real estate career. Tim introduced Marina to Igor Kagan as a potential investment partner. In February 2013, Marina and Kagan purchased a condominium at 1400 Lake Shore Drive in Chicago for $130,631. Marina purchased her share with $30,000 from a separate premarital account. Marina first transferred the funds from her account to a joint account before purchasing the unit.

After a few successful investments, Tim joined Marina and Kagan in investing in other properties. Nine months after the Lake Shore Drive purchase, Tim provided $35,000 from his 401k account to bring the couple's total ownership of the property to

50 percent. In 2016, the parties and Kagan parted ways and the parties received Kagan's interests in the Lake Shore Drive condominium.

Marina and Tim's son was born the following year in September 2017.

In June 2017, Tim took a job at Johnson & Johnson and the family moved to Kirkland, Washington. The parties retained three Chicago rental properties, including the Lake Shore Drive condominium. Tim and Marina continued with regular arguments. In October 2018, the parties discussed selling the Lake Shore Drive condominium and disagreed on how to split the potential proceeds. Tim called Marina a "bitch," and "threw a glass bowl at her, which she dodged, and the bowl landed close to the child." In early 2019, Marina disclosed to Tim that she consulted a divorce attorney. Tim began regularly threatening her "that she would get deported and [Tim's] mother would raise [their son]."

Finally, on May 29, 2019, the couple had a final physical altercation. Discussing the Lake Shore Drive condominium again, Tim told Marina he wished she were dead, and "started banging on the table with his fist." Tim grabbed their son and began "running back and forth yelling." When Marina tried to take their son, Tim "kicked her in the thigh, causing her to fall on the ground, and ultimately causing a deep bruise. As she tried to get up, [Tim] then pushed her onto a mattress on the floor. At that point [Marina] began to scream for help. The child began crying." Marina grabbed their son, fled, and called the police. Tim was arrested for assault and spent the night in jail.

B. Procedure

Tim filed for dissolution on August 26, 2019. Marina received a temporary domestic violence protection order. Tim filed for a restraining order, but the court

rejected his claim that Marina committed acts of domestic violence. Instead, the court entered a temporary restraining order against Tim, ordering his visitations with their son be supervised. The temporary child support order found that Tim's gross monthly income was $14,300. He was ordered to pay monthly child support of $1,128 and spousal maintenance of $2,000 per month.

A five-day trial began on September 14, 2020. The trial court heard testimony from: Tim, Marina, Alan Ruder, the guardian ad litem, Dr. William Singer, the director of Tim's domestic violence treatment program, Laura Durkin, a marriage and family therapist, John Fountaine, a vocational rehab counselor, Ben Hawes, a CPA, and Julie McDonald, a Family Court Services (FCS) investigator. At the end of trial, the court entered lengthy findings and conclusions.

Based on its findings, the court imposed residential limitations on Tim under RCW 26.09.191 due to his history of domestic violence. The trial court declined, however, to extend the temporary domestic violence protection order. The court awarded Marina sole parental responsibility and decision-making and entered a phased residential schedule for Tim.

The trial court found that the parties agreed Marina needed maintenance for three years. After finding that Tim's gross monthly income was $16,092, the court awarded Marina monthly maintenance of $5,000. After considering expenses and the maintenance award, the trial court determined that Tim would be left with a monthly net income of $5,610 after taxes.

The trial court calculated child support based on the parties' actual incomes, ordering Tim to pay $732 in monthly child support. The court refused to impute additional income to Marina finding she was not voluntarily unemployed.

The trial court awarded each party a rental property. The trial court did not include the rental income in calculating child support. Tim's property had mortgages and expenses that consumed the rent and Marina's rental was vacant and impacted from COVID-19. The court found the property's "future revenue stream is uncertain." The trial court applied Illinois law to characterize the proceeds from the sale of the Lake Shore Drive property. The court found Marina had a 23 percent separate property interest because she contributed $30,000 of separate funds to its acquisition. The court found the remaining 77 percent interest was community property.

## ANALYSIS

A. Maintenance

Tim argues that the court abused its discretion in awarding spousal maintenance of $5,000 per month for 3 years. We disagree.

By statute, trial courts have discretion to grant maintenance orders to either spouse:

> The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
>
> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment

appropriate to his or her skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance;

RCW 26.09.090(1)(a)-(e).

A trial court's discretion in awarding maintenance is "wide. . . . The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just." In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). Maintenance is a flexible tool for equalizing the parties' standard of living for an appropriate period. In re Marriage of Wright, 179 Wn. App. 257, 269, 319 P.3d 45 (2013).

As for the duration of maintenance, the trial court found:

The parties agree on the length of time spousal maintenance is necessary—three years—and the Court agrees with that time frame. Three years is sufficient for the mother to maintain her role as primary caregiver and stay-at-home mother as the parties contemplated. In this time, [Marina] can also address whatever therapy needs she has based on Lana Polinger's diagnosis of PTSD [Marina] suffered due to the abuse during the marriage (Ex. 123), and her child might have experienced collaterally, without the added stress of full-time employment. See [In re Marriage of Foran, 67 Wn. App. 242, 258, 834 P.2d 181 (1992)]. Yet the Court also finds that [Marina] should be able to use this time to study for and take whatever licensure test in the real estate market, which befits her background and interest.[2]

---

[2] Marina's therapist, Lana Polinger, did not testify, but the results of her analysis of Marina were introduced, without objection, through the testimony of FCS counselor Julie McDonald:

She described the mother as presenting as a "textbook victim of domestic violence." She described symptoms. Symptoms [Marina] presented, which include depression, low self-esteem, anxiety and constant worry, flashbacks to dramatic events, guilty, and social withdrawal. "I've noticed the mother to have posttraumatic stress disorder from the relationship with the father."

Tim does not dispute that the parties agreed on the length of time. Tim instead argues that the court inappropriately "anchored" its maintenance decision on Foran when considering Marina's PTSD in awarding maintenance. In Foran, the wife was subject to severe physical and emotional abuse to the degree that an expert testified she needed at least two years of intensive psychotherapy because of the abuse, and perhaps as much as five years. 67 Wn. App. at 247. The court held that it is within the trial court's discretion to consider a spouse's level of PTSD in terms of that spouse's present employability and prospective earning capacity. Foran, 67 Wn. App. at 258.

While there are factual differences between Foran and this case, its holding that it is within the trial court's discretion to consider a spouse's level of post-traumatic stress disorder in terms of that spouse's present employability and prospective earning capacity is on point. Foran, 67 Wn. App. at 258. Tim does not challenge Marina's diagnosis of PTSD. His own expert acknowledged that an individual with that diagnosis leaving a situation of domestic violence may have a "barrier to returning to work."

Tim agreed to a duration of maintenance of three years. In addition, the court considered the RCW 26.09.090 factors. The court found three years was sufficient for Marina to maintain her role as primary caregiver as the parties originally contemplated. The court also determined that Marina could address any therapy needs based on Lana Polinger's diagnosis of PTSD resulting from the abuse during the marriage, along with any the child may have suffered as well. The court also noted that Marina should use the time to complete licensure requirements to rejoin the real estate market after three years.

The trial court determined Tim's gross monthly income was $16,092, and after considering the parties' claimed expenses, determined Tim's net monthly income equals $10,610. The court arrived at $5,000 for monthly maintenance to level the parties' income for the three-year period, leaving Tim with $5,610 of net monthly income after taxes. The trial court considered the facts and circumstances along with the financial needs and abilities of each party. The trial court did not abuse its discretion in granting spousal maintenance of $5,000 per month for 3 years.

## B. Child Support

Trial court decisions on child support will seldom be changed on appeal. In re Marriage of Booth, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). The parent challenging a decision must show that the trial court manifestly abused its discretion. Booth, 114 Wn.2d at 776. A court's award of child support, including the decision of whether to impute income to a parent, is reviewed for abuse of discretion. In re Marriage of Shui & Rose, 132 Wn. App. 568, 588, 125 P.3d 180 (2005). A trial court abuses its discretion if the decision rests on unreasonable or untenable grounds. In re Marriage of Leslie, 90 Wn. App. 796, 802-03, 954 P.2d 330 (1998).

### 1. Imputed Income

Tim argues that the trial court abused its discretion in not finding Marina voluntarily unemployed, and therefore failing to impute income to her. We disagree.

In determining income, the trial court is required to impute income to a parent who is voluntarily unemployed or voluntarily underemployed. RCW 26.19.071(6). The court determines whether the parent is voluntarily unemployed based on the parent's work history, education, health, and age, or any other relevant factors. RCW

26.19.071(6). In deciding whether a parent is voluntarily unemployed and therefore income imputed, the "superior courts are in the best position to determine what factors are relevant in any particular case." In re Marriage of Bundy & Rush, 12 Wn. App. 2d 933, 940-41, 460 P.3d 1111 (2020). "Care for the community and children are 'other relevant factors' that the trial court must consider in determining whether [a spouse] was voluntarily unemployed." In re Marriage of Kaplan, 4 Wn. App. 2d 466, 485, 421 P.3d 1046 (2018); RCW 26.19.071(6). Additionally, contemporaneously awarded maintenance must be considered when determining the income and net income to calculate child support. In re Matter of Marriage of Condie, 15 Wn. App. 2d 449, 458, 475 P.3d 993 (2020).

Tim argues that the trial court misapplied this court's decision in Kaplan. In Kaplan, the parties were married for 25 years at the time of dissolution. We concluded that the trial court had erred in imputing income to the wife for two reasons. First, the trial court ignored that it had awarded the wife $10,000 per month for maintenance as required by RCW 26.19.071(3)(q). Kaplan, 4 Wn. App. 2d at 484-85. And second, we concluded that under RCW 26.19.017(6), "[c]are for the community and children are 'other relevant factors' that the trial court must consider in determining whether [the wife] was voluntarily employed." And consequently, the trial court disregarded its own finding that "Ms. Kaplan put her employment advancement on hold in support of the community; specifically, so that she could care for the children as well as support Mr. Kaplan's career goals that took him out of town extensively." Kaplan, 4 Wn. App. 2d at 485.

While we agree that the facts in Kaplan are distinguishable, the trial court did not err in its analysis. Instead, the trial court explained:

Kaplan is distinguishable because in that case it was a 25-year marriage, whereas in this case the parties were married for only 7 years. However, that distinction is not dispositive here. In Kaplan, the rationale for not finding voluntary un(der)employment was the trial court's finding that "Ms. Kaplan put her employment advancement on hold in support of the community: specifically, so that she could care for the children as well as support Mr. Kaplan's career goals that took him out of town extensively." [Kaplan, 4 Wn. App. 2d at 485.].

The Court finds that Respondent did much the same once the child was born, by agreement of the parties that she would be the stay-at-home mother while Petitioner developed his career. Because Respondent is only asking for maintenance for three years until the child would go to school, the Court finds in its discretion that the underlying principle in Kaplan applies. Once the child is 6 years old and maintenance ceases, Respondent will have completed these full-time parenting duties that the parties intended if they had stayed together. In addition, Respondent will have had time to ready herself to re-enter the workforce, for instance by studying for and sitting the Washington real estate agent/broker licensure examination as mentioned above. At that point Respondent can seek adjustment to reflect that Respondent will no longer have grounds to claim voluntary un(der)employment.

The trial court did the correct analysis. It considered its three-year award of maintenance, as well as the parties' agreement, and efforts Marina would need to take to prepare to rejoin the workforce. The trial court did not manifestly abuse its discretion.

2. Rental Income

Tim also argues that the trial court erred by failing to include rental income from Marina's vacant Chicago condominium in the child support calculation. We disagree.

Income for child support purposes includes rental income. RCW 26.19.071(3)(u). The court awarded Marina the North Marine Drive condominium and Tim the Dearborn Street condominium. At the time of trial, Marina's North Marine Drive condominium had been empty at least seven months from COVID-19 related problems. Tim was currently

renting out the Dearborn condominium, however, the trial court recognized the mortgage and expenses consumed the rent received. Thus, the trial court declined to include rental income for either property into the child support order.

Tim argues that not including Marina's rental income in the child support calculation was error because the Dearborn Street condominium could receive rental income in the future. But the trial court exercised its discretion in not calculating rental income for either party because of the uncertainty of the future revenue stream in relation to Marina's property, and the lost expenses on Tim's property. Tim claims it is not reasonable to assume the apartment will remain vacant the next 15 years. While this is true, it is also not reasonable to assume Tim's rental property will always lose money. The trial court cannot anticipate the future, it can only reasonably exercise its discretion to enter a fair child support decree. If the situation changes in the future, either party can seek modification under RCW 26.09.170. The trial court did not abuse its discretion.

C. Property Distribution

Tim argues that the trial court erred in characterizing the proceeds from the sale of the Lake Shore Drive condominium by finding that a portion of the proceeds were Marina's separate property. We disagree.

The "ultimate characterization of the property as community or separate is a question of law" that is reviewed de novo. Schwarz v. Schwarz, 192 Wn. App. 180, 192, 368 P.3d 173 (2016). The factual findings supporting the trial court's characterization are reviewed for substantial evidence. Schwartz, 192 Wn. App. at 192.

-11-

1. Choice of Law

This court reviews de novo the choice of law and its application to the facts in the case. State v. Corona, 164 Wn. App. 76, 78, 261 P.3d 680 (2011). Tim argues the correct test in choosing what law applies is governed by Wright, 179 Wn. App. at 265, which provides:

> Where there is a conflict of laws, the court determines which state's law to apply by evaluating which jurisdiction has the "most significant relationship" to a given issue. This is determined under the principles stated in Restatement (Second) Conflict of Laws § 6 (1971), which include:
>
>    (a) the needs of the interstate and international systems,
>
>    (b) the relevant policies of the forum,
>
>    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
>    (d) the protection of justified expectations,
>
>    (e) the basic policies underlying the particular field of law,
>
>    (f) certainty, predictability and uniformity of result, and
>
>    (g) ease in the determination and application of the law to be applied.

Wright is distinguishable because the court was distributing the goodwill of the spouse's practice, not characterizing the property as separate or community. In contrast, when characterizing property, our Supreme Court has held that "the state law applied to determine the characterization of property is that of the state where the couple resided at the time the property was acquired." In re Marriage of Zahm, 138 Wn.2d 213, 225, 978 P.2d 498 (1999). Washington has long accepted this principle. See In re Marriage of Landry, 103 Wn.2d 807, 810, 699 P.2d 214 (1985). The

Restatement (Second) of Conflict of Laws enforces this principle as well: "greater weight will usually be given to the state where the spouses were domiciled at the time the movable was acquired." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 258 (AM. LAW INST. 1971). Here, the parties resided in Illinois and purchased the condominium in Illinois in 2013. The trial court properly applied Illinois law to the characterization of the Lake Shore Drive condominium.

2. Separate Property

Tim next argues that the trial court's decision to identify Marina's contribution to the Lake Shore Drive condominium as separate property is unsupported because no clear tracing can be established, and Marina cannot overcome the community property presumption.

To assign or divide property upon dissolution, the court must classify property as either marital or nonmarital. In re Marriage of Cecil, 202 Ill. App. 3d 783, 787, 560 N.E.2d 374, 148 Ill. Dec. 72 (1990). Section 503 of the Illinois Marriage and Dissolution of Marriage Act defines marital property as "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," and nonmarital property as "property acquired in exchange for property acquired before the marriage." 750 ILL. COMP. STAT. 5/503(a)(2). "Property acquired by either spouse after the marriage, but prior to the dissolution, is presumed marital property regardless of how title is actually held . . . . This presumption of marital property is overcome upon a showing that the property at issue was acquired by one of the exceptions enumerated in section 503(a)." Cecil, 202 Ill. App. 3d at 787. "This presumption may be rebutted by clear, convincing, and unmistakable evidence that no gift was intended." Cecil, 202 Ill.

App. 3d at 787. Whether a party sufficiently traces their separate property to overcome the presumption of community property "is a question of fact" for the factfinder. Schwarz, 192 Wn. App. at 192.

Here, the trial court found that Marina overcame the burden of presumption and established separate investment in the Lake Shore Drive condominium. The trial court found that evidence showed Marina withdrew $30,000 from her Wachovia account—which consisted of separate assets from her prior job at Transcon and the sale of a previous apartment—and deposited it in the parties' joint account on January 2, 2013. The account shows a deposit by Kagan the next day of $139,470. The trial court concluded the tracing argument is a distraction because

> it is unmistakable and hardly disputed that the $30,000 was Respondent's separate, or "non-marital" asset. The joint real estate purchase in question occurred soon thereafter. Respondent never intended to gift her 23% to the community. In fact, she testified clearly and convincingly that she purchased the real estate transaction over Petitioner's objections and criticism of the deal as a "risky" venture. There was testimony as late as 2019 that Respondent was still claiming this approximate 23% interest, which caused arguments between the parties. Finally, Petitioner conceded that the 1400 North Lake Shore Drive property was not part of the parties' like-kind exchanges with the Kagans involving other property purchased together.

Tim objects to the trial court's finding, arguing that his tracing expert, Ben Hawes, testified that he could not show a clear tracing sufficient to establish a separate property interest. Hawes determined it was simply not possible to directly or indirectly trace either party's contribution, such that it retained its separate character to establish it paid for the condominium. The testimony of a single credible witness can qualify as clear and convincing evidence, even if the witness's testimony is contradicted by other witnesses. Dalton v. State, 130 Wn. App. 653, 666, 124 P.3d 305 (2005). Here, the

trial judge analyzed bank documentation to determine that there was clear and convincing evidence to support the notion that Marina used $30,000 of her separate property to invest in the Lake Shore Drive condominium. That evidence is not simply self-serving testimony, but derived from financial record. Even though Tim's expert did not find traceability enough to uphold a finding of separate property, the trial court found it clear and convincing that the initial investment was Marina's based on appropriate financial documentation. The trial court did not err in concluding that Marina's initial investment in the Lake Shore Drive condominium is separate property.

Tim also argues that the trial court erred in awarding Marina 23 percent of the proceeds rather than limiting the reimbursement from the sale proceeds to a dollar for dollar basis based on her initial $30,000 contribution. This argument ignores that under Illinois law, any increase in "non-marital property" remains non-marital property even if the increase "results from a contribution of marital property, non-marital property, the personal effort of spouse, or otherwise." 750 ILL. COMP. STAT. 5/503(a)(7). The trial court correctly concluded that because Marina contributed 23 percent of the initial cost of the Lake Shore Drive condominium, she should receive 23 percent of the sale price to reflect the increase in the property.

D. Attorney Fees

Marina argues that this court should award her attorney fees for having to defend the trial court's final orders on appeal.

This court has discretion to award attorney fees after considering the relative resources of the parties and the merits of the appeal. RCW 26.09.140; Leslie, 90 Wn. App. at 807. Here, the court's property division and maintenance award left the parties

in roughly equal financial position.  The appeal, while ultimately unsuccessful, was not so meritless to punish Tim for exercising his right to appeal.  RAP 2.2.  We decline to award attorney fees on appeal.

Affirmed.

_Mann, J._

WE CONCUR:

_Bowman, J_        _Appelwick, J.P.T._