IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 74427-5-I |
| | ) | (Consolidated with No. 74428-3-I) |
| GINGER ANN GALANDO, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| MATTHEW PAUL GALANDO, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 28, 2017 |

SCHINDLER, J. — Following a lengthy trial, the court entered a decree of dissolution of the marriage of Matthew Paul Galando and Ginger Ann Galando, findings of fact and conclusions of law, a parenting plan, and a child support order. Matthew seeks reversal of the decree, the parenting plan, and the child support order. The Intervenor Successor Trustee of The Joseph A. Galando Descendants' Trust for the benefit of (f/b/o) Matthew Galando seeks reversal of the child support order, the community property marital lien in favor of Ginger, the award of maintenance, and the award of attorney fees. We reverse characterization of gifts as community property, the order to pay college tuition as part of the property division instead of maintenance, and imposition of a parenting plan condition that restricts Matthew from contacting the police. In all other respects, we affirm.

FACTS

Twenty-one-year-old Ginger started dating Matthew Galando in 1996. Ginger was earning minimum wage working at a gym. Matthew's parents Joseph and Barbara Galando owned Sea Coast Foods. Matthew worked at Sea Coast Foods. Matthew got Ginger a job working at Sea Coast Foods. After dating three or four months, Ginger and Matthew started living together. The couple moved to work at Sea Coast Foods in California. Matthew purchased a house and paid the mortgage. Ginger paid the household expenses.

On November 25, 1998, Matthew's parents established the Joseph A. Galando Descendants' Trust (JAG Trust) and the Barbara J. Galando Descendants' Trust (BJG Trust) for the support, maintenance, health, and education of their three adult children: Steven, David, and Matthew, and their children and grandchildren. The JAG Trust and the BJG Trust appoints the three sons as trustees. The trust agreement gives the trustees the power to "[e]ffect distribution of property and money in divided or undivided interests" and to "[p]urchase, sell and/or deal in any and all real estate investments." The trust appoints an "Independent Trustee." The trust agreement states the Independent Trustee shall have "any duties and powers delegated to the Independent Trustee by the Trustee." On November 25, 1998, Joseph and Barbara also established the Joseph A. Galando Descendants' Trust f/b/o each of the three adult children: Steven, David, and Matthew.

In 1999, Joseph and Barbara Galando sold Sea Coast Foods to Aurora Foods. That same year, they divided a portion of the JAG and BJG Trusts into three separate shares that were distributed to the three Decedents' Trusts, including the Joseph A.

Galando Descendants' Trust f/b/o Matthew Galando (Trust). Matthew's parents appointed Matthew and an Independent Trustee as trustees of the Trust. The Trust gives Matthew the sole discretion to distribute income and principal for his benefit and the benefit of his children as he "deems reasonable for . . . support, maintenance, health and education."

After the sale of Sea Coast Foods, Matthew and Ginger got engaged and moved back to Washington. From 2000 until 2001, Matthew worked at Aurora Foods. Matthew earned $100,000 plus a $20,000 bonus. Ginger worked at Costco full time. Matthew and Ginger married on July 14, 2000.

At the end of 2001, Matthew quit his job at Aurora Foods. Matthew used Trust funds to pay $1.8 million in cash to purchase property in Redmond and build a house for Ginger and himself. Matthew started a home-theatre installation business, Home Theatre Concepts. In addition to Trust income, Matthew earned approximately $40,000 a year from Home Theatre Concepts. In 2002, Ginger enrolled at the Art Institute of Seattle. But after earning a degree in fashion design, Ginger could only find a job in retail.

Matthew was injured in October 2005 while riding his motocross bike. Matthew underwent a number of surgeries on his ankles. In 2006, Ginger gave birth to their first child G.G. Their second child M.G. was born in 2008. After the children were born, Matthew and Ginger agreed she would not work and stay home to care for the children.

In 2008, Matthew worked as a mortgage banker on commission and earned approximately $24,000 before he was "let go." In 2009, Matthew started a landscaping

business, Raven Landscape and Maintenance. In 2010, Matthew started a business selling guitar equipment, Amps Northwest.

Matthew became addicted to pain medication. Matthew withdrew from Ginger and the children and in 2013, he began to exhibit bizarre behavior. Matthew would stay up all night, sleep all day, and experience hallucinations. Matthew started keeping loaded firearms in the bedroom and kitchen. Matthew installed a home security system with surveillance cameras and spent hours watching the surveillance tapes. Ginger was afraid for her safety and the safety of the children.

Ginger insisted Matthew get help. In 2014, Matthew agreed to enroll in a two-month inpatient rehabilitation center in California. When Matthew returned, he did not spend time with Ginger or the children. On June 5, 2014, Matthew told Ginger he wanted a divorce.

On August 12, 2014, Ginger filed a petition for dissolution. On September 30, the court entered a temporary order. The court appointed a guardian ad litem (GAL) and entered a temporary parenting plan and order of child support. The parenting plan designates Ginger as the residential parent. The court ordered Matthew to pay approximately $1,500 in child support. The child support work sheet lists $7,333 in interest and dividend income and $10,000 a month in income for Matthew. The child support order states Matthew "shall pay 100% of the children's school tuition." The court ordered Matthew to pay Ginger $4,000 a month in maintenance beginning October 1, 2014. The order states Ginger and the children "shall exclusively occupy" the Redmond residence and ordered Matthew to move out by October 12. The order

4

explicitly restrains and enjoins both parties from "transferring, removing, encumbering, concealing, or in any way disposing of any property."

When Matthew did not move out of the house, Ginger obtained a restraining order. Matthew did not comply with the court orders to pay maintenance or school tuition.

On February 12, 2015, the GAL filed a 50-page report. The GAL recommended the court designate Ginger as the residential parent and the children reside with Matthew every other weekend. The GAL recommended Matthew continue to see nurse practitioner Elizabeth Mueller for drug treatment and "individual counseling," "abstain from all use of alcohol and illegal drugs," and obtain urinalysis (UA) testing. The GAL recommended Ginger "enroll in individual counseling."

In late February, Matthew's father contacted Edward Ahrens and requested that he act as the "Successor Independent Trustee." The March 3, 2015 "Appointment of Successor Independent Trustee" states that "as it relates to The Joseph A. Galando Descendant's Trust, f/b/o Matthew P. Galando," Ahrens has "[t]he power and authority to deal with and manage all matters . . . involving trust assets, including but not limited to any real estate issues arising out of Matthew P. Galando's divorce proceedings."

On March 27, Ahrens filed a motion to intervene in the dissolution. The court granted the motion. On April 13, Ahrens (Successor Trustee) filed a motion to modify or revoke the temporary order that allowed Ginger and the children to live in the Redmond house and "preclude the collection of any pecuniary spousal maintenance award from the trust assets."

5

In opposition, Ginger noted that in an earlier declaration, Matthew stated the residence was his separate property and admitted he received over $15,000 in net monthly income from his business and Trust. Ginger also noted that she had agreed to move out of the residence before the Successor Trustee filed the motion. The court granted the motion to modify the temporary order as to Ginger's exclusive occupancy of the residence. The court found Matthew in contempt for violating the temporary order by not paying maintenance to Ginger.

On June 11, 2015, Ginger filed a motion to compel discovery and impose sanctions against the Successor Trustee and Matthew. Ginger asserted Matthew provided only partial disclosure of financial records and in response to discovery, the Successor Trustee provided no disclosure of financial records, including assets and financial statements. Ginger also asserted Matthew violated the terms of the temporary parenting plan and child support order by refusing to sign admission forms and pay school tuition.

The court granted the motion to compel discovery and impose sanctions. The court ordered the Successor Trustee and Matthew to produce all the requested records. The court ordered Matthew to sign the school admission forms and make full payment of all tuition for the 2015-2016 school year. Because of "ongoing intransigence and failure to provide discovery responses," the court awarded attorney fees of approximately $3,300.

The approximately 12-day dissolution trial began on July 15, 2015. A number of witnesses testified. The court admitted into evidence the GAL report and voluminous family trust and partnership agreements and financial records.[1]

Successor Trustee Ahrens testified the former Independent Trustee had very limited powers and minimal involvement. Ahrens testified that his role was limited to issues relating to the residence owned by the Trust and the dissolution proceeding. Ahrens said Matthew has the sole authority to make investment decisions and decide how much to distribute from the Trust. Ahrens testified that all the distributions that Matthew made before Ahrens' appointment were consistent with the requirements of the Trust—"He's not made improper distributions." According to Ahrens, he and Matthew agreed in March 2015 to sell the Redmond house.

Ahrens testified at length about Trust investments and income. Ahrens testified the Trust has assets of approximately $5 million with income of approximately $150,000 a year. The Trust received income from family trusts; the Stephen, David, Matthew (SDM) Trust; and other investments, such as the Galando Investments Limited Partnership (LP). Ahrens also testified that Matthew was the beneficiary of other family trusts.

Ahrens testified that in 2013, the Trust received a payment of $138,392 from an investment, Coachman Energy Land II; an interest payment from the SDM Trust of $163,014 on a $2.9 million promissory note; and a distribution from real estate investment Trico II of $10,182. The distributions to Matthew in 2013 totaled $195,953. In 2014, the Trust received an interest payment of approximately $97,000 from the SDM Trust and a distribution from Trico II of $26,187. The distributions to Matthew in 2014

---

[1] There are nine large binders of exhibits.

totaled $235,900.  Certified public accountant Kevin Grambush also testified about the historical income distributions from the Trust.

Matthew testified about the motocross bike accident and his drug addiction, his employment history, the businesses he started, and acquisition of personal property during the marriage.  Matthew testified that he planned to list the Redmond house for sale.

Ginger testified she was "unaware" that the Trust owned the house—"I remember sitting in the real estate office singing paperwork. . . . Matt signed it.  I signed it.  It's our home."  Ginger said it was not "until years later that Matt had mentioned for purposes of tax reasons . . . the home was in . . . the trust, which I didn't understand what that meant."  Ginger testified about the children, the relationship with Matthew, and her concerns about his behavior.

At the conclusion of the trial, the court entered findings of fact and conclusions of law, a decree of dissolution, a parenting plan, and an order of child support.  The court found "[t]his is a long-term marriage" because the parties lived together in a committed relationship for four years and married in 2000.  The court found all of the property acquired during their relationship and marriage is community property except Matthew's interest in his Trust and the other family trusts and partnerships:  the SDM Trust, the Galando Gift Trust, the Galando Family LP, the Galando Hawaii LP, and the Galando House Qualified Personal Residence Trusts (QPRTs).

The findings of fact and conclusions of law and the decree incorporate the "Galando Asset Liability Spreadsheet," exhibit 43A.  The spreadsheet identifies separate and community property and the value of the property.  The total value of the

8

community property is $1,059,445. The spreadsheet identifies the value of Matthew's Trust at $5 million and the combined value of the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT at $3 million.

The court awarded Matthew almost all of the community property, including the Amps Northwest inventory, cars and motorcycles, jet skis and trailers, more than half of the Northwestern Mutual life insurance policies, firearms, golf clubs, mountain bikes, and a painting, totaling $760,852. The court awarded Ginger a Schwab individual retirement account (IRA), the remainder of the Northwestern Mutual life insurance policies, one car, and two paintings for a total value of $303,150. The court awarded Ginger a lien of $756,295 to offset the community property award to Matthew. The court found it was "fair and equitable to award the division of community property to the parties as set forth in Exhibit 43a, which will result in a marital lien owed to Petitioner by Respondent of $756,295." The court ordered Matthew to use "sales proceeds of the residence" to pay the lien.

The court ordered Matthew to pay $4,000 a month in spousal maintenance until December 31, 2021 and the costs of obtaining a four-year degree for Ginger. The court entered a child support order and a parenting plan designating Ginger as the residential parent. The court imposed restrictions and conditions on his residential time with the children under RCW 26.09.191, including the requirement to obtain drug and alcohol treatment and monitoring. The court ordered Matthew to pay approximately $100,000 in attorney fees.

ANALYSIS

Matthew appeals the parenting plan, the order of child support, the award of maintenance, and the court's characterization and valuation of community and separate property. The Successor Trustee challenges the child support order and maintenance; the order to pay the community property lien from the proceeds of the sale of the residence; the valuation of $3 million for the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT; and the award of attorney fees.

If the findings of fact are supported by substantial evidence in the record, we accept the findings as verities on appeal. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). Evidence is substantial when there is a sufficient quantum of evidence "to persuade a fair-minded person of the truth of the declared premise." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). "So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it." Burrill, 113 Wn. App. at 868. Unchallenged findings are also verities on appeal. In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). This court does not review the trial court's credibility determinations, nor can it weigh conflicting evidence. In re Marriage of Meredith, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009); In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

1. Parenting Plan

Matthew seeks reversal of the parenting plan. Matthew contends the court erred in finding he engaged in a pattern of emotional abuse, a history of domestic violence, and a long-term impairment from "drug, alcohol, or other substance abuse that

10

interferes with the performance of parenting functions" and by imposing restrictions under RCW 26.09.191[2] on his residential time with his children.

We review parenting plan decisions for abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Katare, 175 Wn.2d at 35. Because of the trial court's unique opportunity to observe the parties, the appellate court is extremely reluctant to disturb a parenting plan. In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

The best interests of the child is the standard "by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002; Schroeder, 106 Wn. App. at 349. In establishing a residential schedule for children in a parenting plan, RCW 26.09.187(3)(a) identifies the factors a trial court must consider, including:

> (i) The relative strength, nature, and stability of the child's relationship with each parent; [and]
>
> . . . .
>
> (iii) Each parent's past and potential for future performance of parenting functions . . . , including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child.

RCW 26.09.187(3)(a) states, "The child's residential schedule shall be consistent with RCW 26.09.191."

Matthew contends substantial evidence does not support finding that he engaged in a pattern of emotional abuse of a child or has a history of domestic violence under RCW 26.09.191(2). We disagree.

---

[2] We note the legislature amended RCW 26.09.191 in 2017 to address parental rights and responsibilities of sexual assault perpetrators and survivors. LAWS OF 2017, ch. 234, § 2. Because the amendments do not affect our analysis in this case, we quote the current version of RCW 26.09.191 throughout the opinion.

The evidence showed Matthew engaged in emotional abuse of the children. According to the GAL,

> [G.G.]'s relationship with his mother appears to be fraying. . . . It is difficult to judge [G.G.]'s concerns objectively because of the high level of conflict and manipulation going on in this case and his young age. [G.G.]'s expressions of anger towards his mother may be a product of his father's manipulation.

The evidence showed M.G. "is afraid of crying" in the presence of Matthew because he "gets mad at her." Ginger testified:

> [G.G.] would cry all the time that I would leave, which I know that they would probably refer to as separation anxiety. But he flat out didn't want to stay with his dad. He told me that he was scared of his dad, and he didn't want to be around him because his dad would yell at him when the kids would cry. And turn on a movie and go upstairs if I left. So even when he had him he wasn't engaged with them.

Matthew also ignored the advice of the children's counselor, resulting in emotional trauma to the children. Contrary to the counselor's advice, Matthew introduced his girlfriend to the children during their first weekend visit with him. Matthew told the children his girlfriend would be moving in and because of the divorce, they would have to change schools.

Although "a history of acts of domestic violence" is not defined, the phrase is "intended to exclude 'isolated, de minimus incidents which could technically be defined as domestic violence.' " In re Marriage of C.M.C., 87 Wn. App. 84, 88, 940 P.2d 669 (1997) (quoting 1987 PROPOSED PARENTING ACT, REPLACING THE CONCEPT OF CHILD CUSTODY, Commentary and Text 29 (1987)). RCW 26.50.010(3)(a) defines "domestic violence" as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members."

Ginger testified that although Matthew never physically assaulted her, she feared for her safety and the safety of her children. Ginger testified Matthew "always had a gun upstairs" and insisted on keeping a loaded gun in the kitchen for "[w]hatever he was paranoid of." Ginger testified Matthew would get so angry with her he would spit in her face. Ginger told the GAL that Matthew physically intimidates her and makes her feel threatened.

> Physically intimidating, you know. So angry that he is spitting in my face. And that, you know, pretty much when, you know, I confront him too because at the time that I had spoke with [family friend and physician] Dr. Rice already I guess that's what his father suggested I do, and that's when I found out too about this prescription history, and I confronted him, you know, about that. And, you know, he cornered me in the bathroom upstairs and, you know, threatened me.

Ginger testified that while using drugs, Matthew "went through a long period of hallucinations."

> He would wake me up all hours of the night, and tell me that there was Stealth helicopters in the backyard. And ninja guys crawling up the side of the house. And, you know, just before these episodes started happening he had spent a good amount of money on a home security system because he would spend quite a few hours, you know, going over the videos throughout the day of what the cameras recorded. It's how he eventually would spend his nights.

Substantial evidence supports the court finding Matthew engaged in emotional abuse of the children and has a history of domestic violence. Under RCW 26.09.191(2)(a), the court shall limit a parent's residential time. RCW 26.09.191(2)(a) states, in pertinent part:

> The parent's residential time with the child shall be limited if it is found that the parent has engaged in any of the following conduct: . . . . (ii) physical, sexual, or a pattern of emotional abuse of a child; [or] (iii) a history of acts of domestic violence as defined in RCW 26.50.010(3).

The parenting plan states, in pertinent part:

1.    All visitation for father with the children set forth herein is contingent upon father's compliance with the following requirements:

    a.    Six months of negative observed 12-panel UAs . . . .
    b.    Enrollment in and compliance with [Narcotics Anonymous]/[Alcoholics Anonymous] sponsorship program .
. . .
    c.    Father shall enroll and actively participate in treatment for alcohol addiction with a state-certified drug/alcohol treatment provider. . . .

. . . .

**If father fails to comply with any of the above requirements, his visitation and all contact with both children shall be suspended pending further court order.**

Matthew admits long-term impairment from drug addiction.  But Matthew argues that because no evidence supports finding long-term impairment from alcohol, the court erred by imposing restrictions under RCW 26.09.191(3) and restricting residential time with the children.

RCW 26.09.191(3) authorizes a court to limit provisions of a parenting plan if a parent has a long-term impairment resulting from drug or alcohol abuse.  RCW 26.09.191(3) states, in pertinent part:

A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:
. . . .
(c)  A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions.

Matthew cites In re Marriage of Chandola, 180 Wn. 2d 632, 327 P.3d 644 (2014).

In Chandola, the court held RCW 26.09.191(3) restrictions "apply only where necessary to 'protect the child from physical, mental, or emotional harm' " and "[a] trial court

abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent such a harm." Chandola, 180 Wn. 2d at 648 (quoting RCW 26.09.002).

The court found Matthew had a long-term impairment from drug and alcohol abuse. Section 2.2 of the parenting plan states, in pertinent part:

> The Father's involvement or conduct may have an adverse effect on the children's best interests because of the existence of the factors which follow:
>
> [X] A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions.

Substantial evidence supports finding long-term impairment from the use of alcohol that interferes with parenting. Nurse Mueller testified that Matthew has a "history of alcohol abuse." Nurse Mueller's intake assessment lists "Alcohol Abuse" as part of Matthew's diagnoses.[3] Ginger testified that Matthew "always had alcohol" and he "never stopped drinking alcohol." We also grant Ginger's motion to supplement the record with previously undisclosed documents that show long-term alcohol abuse. Because substantial evidence supports the court finding long-term alcohol abuse that interferes with the performance of his parenting functions, the court did not abuse it discretion by imposing the requirement to obtain an alcohol assessment and monitoring conditions as a condition of visitation.[4]

Matthew also challenges the condition that prohibits him from having contact with the police as a condition of his residential time. The parenting plan states, in pertinent

---

[3] At oral argument, Matthew conceded he was diagnosed with alcohol abuse.

[4] For the first time on appeal, Matthew contends the court erred by not ordering supervised visitation as an alternative to restrictions on his residential time. Because Matthew did not raise this issue below, we refuse to consider it on appeal. RAP 2.5(a).

part:

> [I]f [Matthew] has any contact with the police, including any accident, domestic violence, or alcohol-related issues (regardless of who is the alleged perpetrator, if there is any arrest, conviction or dismissal), the children's contact with the father shall be automatically restricted.

Because the provision is not supported by the evidence and is not reasonably calculated to prevent the identified harm, the court abused its discretion by imposing this condition.

Matthew challenges the requirement in the parenting plan that "[b]oth parties shall participate in a full psychological evaluation" and "comply with all treatment recommendations." Matthew argues the GAL recommended only Ginger enroll in individual counseling. A court is not bound by the recommendation of the GAL "but instead must make its own assessment of the child's best interests." In re Marriage of Swanson, 88 Wn. App. 128, 138, 944 P.2d 6 (1997). While nurse Mueller testified she was "helping [Matthew] with an anxiety disorder," there was no evidence he had obtained "a full psychological evaluation." The court did not abuse its discretion by ordering Matthew to undergo psychological evaluation.

## 2. Child Support

Matthew contends the court erred by concluding the deviation standards under RCW 26.19.075 govern and imputing earned income of $8,333 per month. We review imputation of income for a voluntarily unemployed parent for abuse of discretion. In re Marriage of Shui, 132 Wn. App. 568, 588, 125 P.3d 180 (2005).

The court rejected the argument that Matthew was disabled and found he was voluntarily unemployed. The unchallenged findings state, in pertinent part:

> Obligor's claim of "disability" was not supported by any evidence and was self-serving. His trial testimony was that he has not applied for any employment. Evidence provided at trial proved Obligor has been employed in businesses and daily activities which contradicted his claim of being unable to work.[5]

Under RCW 26.19.071(6), a court imputes income to a parent for the purpose of child support when that parent is voluntarily unemployed. RCW 26.19.071(6) states, in pertinent part:

> The court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed. The court shall determine whether the parent is voluntarily underemployed or voluntarily unemployed based upon that parent's work history, education, health, and age, or any other relevant factors.

The record shows Matthew worked full time from 2000 to 2001 at Aurora Foods earning $100,000 and a $20,000 bonus. After 2001, Matthew started businesses, sporadically worked, and lived primarily on his Trust income. Matthew admitted, "I haven't applied for any jobs . . . because I haven't found anything that would work yet." Substantial evidence supports finding Matthew was voluntarily unemployed. The court did not abuse its discretion by finding that Matthew was voluntarily unemployed.

Under RCW 26.19.071(6), a court imputes income at a past rate of pay where information on current or historical rates of pay is incomplete or sporadic. RCW 26.19.071(6) states, in pertinent part:

> In the absence of records of a parent's actual earnings, the court shall impute a parent's income in the following order of priority:
> (a) Full-time earnings at the current rate of pay;

---

[5] Matthew admitted he performed maintenance on the house after his injury and continued to engage in recreational activities such as golf.

(b) Full-time earnings at the historical rate of pay based on reliable information, such as employment security department data;
(c) Full-time earnings at a past rate of pay where information is incomplete or sporadic.[6]

Substantial evidence supports the finding that Matthew's "[r]eliable historical rate of pay information" is "$100,000/year." Matthew testified that his annual income from 2000 to 2001 was "$100,000 with a $20,000 bonus."

Matthew also argues the child support worksheet improperly requires consideration of Trust income of $15,233.00 per month. While the worksheet requires a parent to disclose "Other Income," the record shows the court imputed income of $8,330.30 based on his earnings in 2000 to 2001.

Matthew argues that under RCW 26.19.075(5), the court cannot rely on an agreement of the parties to order child support in excess of the standard calculation. RCW 26.19.075(5) states, "Agreement of the parties is not by itself adequate reason for any deviations from the standard calculation."[7]

There is no dispute Matthew agreed to a slight deviation in child support from $1,635.66 to $1,800.00 a month.

### 3.7 REASONS FOR DEVIATION FROM STANDARD CALCULATION.

[X] The child support amount [of $1,800] ordered in paragraph 3.5 deviates from the standard calculation for the following reasons:

    [X] Possession of wealth;
    [X] A significant disparity in the living costs of the parents due to conditions beyond their control;
    [X] Other reason(s) for deviation: Agreement of the parties and trial testimony.

    The factual basis for these reasons is as follows: Obligor has assets valued in excess of $8 million. Obligor receives

---

[6] Emphasis added.
[7] Emphasis added.

significant financial support from his trusts/investments and has limited living expenses. Obligor proposed an upward deviation to $1,800 transfer payment. Obligee agrees with the proposal to attempt to balance the vastly disparate living situations and resources in the parents' respective households and provide for the established needs of the children.

The unchallenged findings show the court did not base the deviation solely on Matthew's agreement to pay the upward deviation. The order of child support lists two other reasons for the deviation: "[p]ossession of wealth" and "significant disparity in the living costs of the parents due to conditions beyond their control." RCW 26.19.075(1)(a)(vi) and (c)(ii) identify possession of wealth and disparity in living costs as reasons for deviating from the standard calculation. RCW 26.19.075 provides a nonexclusive list of the types of wealth the court may consider. RCW 26.19.075(1) states, in pertinent part:

> Reasons for deviation from the standard calculation include but are not limited to the following:
> (a) **Sources of income and tax planning.** The court may deviate from the standard calculation after consideration of the following:
> . . . .
> (vi) Possession of wealth, including but not limited to savings, investments, real estate holdings and business interests, vehicles, boats, pensions, bank accounts, insurance plans, or other assets.[8]

The court did not err in ordering Matthew to pay $1,800.00 a month in child support, an upward deviation of $164.34 from the standard calculation of $1,635.66.

In re Marriage of Daubert, 124 Wn. App. 483, 99 P.3d 401 (2004), and In re Marriage of McCausland, 159 Wn.2d 607, 152 P.3d 101 (2007), are inapposite. Daubert and McCausland address the determination of the standard child support obligation, not a deviation from the standard obligation.

---

[8] Emphasis added.

The Successor Trustee contends the court erred by deviating from the standard child support calculation based on Trust assets. The Successor Trustee asserts RCW 26.19.071 authorizes a court to consider "trust income" but not trust assets when determining child support obligations. RCW 26.19.071 states, in pertinent part:

(1) **Consideration of all income.** All income and resources of each parent's household shall be disclosed and considered by the court when the court determines the child support obligation of each parent. . . .

. . . .

(3) **Income sources included in gross monthly income.** Except as specifically excluded in subsection (4) of this section, monthly gross income shall include income from any source, including:

. . . .

(j) Trust income.

The court did not deviate from the child support calculation based on Trust assets. The unchallenged findings show the court considered possession of wealth that includes all sources of income as well as the significant disparity in living costs. The court did not abuse its discretion by basing the deviation on Matthew's wealth and a significant disparity in living costs.

Matthew challenges the order to pay all expenses for his children's daycare, private school tuition, extracurricular activities, and uninsured medical expenses. Daycare and tuition expenses are "extraordinary expenses" excluded from basic child support obligations. In re Yeamans, 117 Wn. App. 593, 599, 72 P.3d 775 (2003). RCW 26.19.080(3) states daycare and tuition expenses "shall be shared by the parents in the same proportion as the basic child support obligation." Where, as here, the court deviates in the basic child support obligation, it may deviate in extraordinary expenses. Yeamans, 117 Wn. App. at 601.

20

3. Maintenance

The Successor Trustee contends the court erred by considering Matthew's Trust assets in awarding spousal maintenance. Because the court did not order Matthew to pay maintenance from Trust income or assets, we disagree.

An award of maintenance is within the broad discretion of the court. In re Marriage of Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). The only limitation on the amount and duration of maintenance under RCW 26.09.090 is that the award must be "just" in light of the factors listed in RCW 26.09.090. In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). The factors that a court must consider include the financial resources of each party; the time needed by the spouse seeking maintenance to acquire education to obtain employment; the standard of living during the marriage; the duration of the marriage; the age, condition, and financial obligations of the spouse seeking maintenance; and the ability of the spouse seeking maintenance to meet financial obligations. RCW 26.09.090; In re Marriage of Vander Veen, 62 Wn. App. 861, 867, 815 P.2d 843 (1991).

The unchallenged findings of fact state:

**2.12 MAINTENANCE.**

[X]  Maintenance should be ordered because:

    [X]  The Wife is unable to meet her needs independently. Wife's income is only $2,600/month gross working at the maximum level available to her. Her reasonable monthly expenses are in excess of $9,000 due to the standard of living, needs of the family and debt acquired during separation.

    [X]  The time necessary to acquire sufficient education or training to enable the Wife to find employment appropriate to her skill, interests, style of life and other attendant

21

circumstances. Wife intends to return to school to complete her 4-year degree in business.

[X]    The standard of living established during the marriage. The parties lived in a $2 million home, had several vehicles and motorcycles, and enjoyed a very substantial lifestyle and income. Their children attend private school by agreement of the parties. They had little debt until separation.

[X]    The duration of the marriage. This is a long-term marriage and relationship in excess of 19 years.

[X]    The age, physical and emotional condition, and financial obligations of the Wife. The wife is age 40 and in good health, but has incurred significant debt since separation. The wife did not act in a frivolous or unnecessary manner when the debt was acquired.

[X]    The standard of living each spouse will experience after dissolution of the marriage. The Husband will continue to receive ample funds and enjoy his luxurious lifestyle after dissolution. The Wife's financial resources will be extremely limited and her assets illiquid.

[X]    The ability of the Husband to meet his needs and financial obligations while meeting those of the Wife;

[X]    A lack of work history, education or training. By agreement of the parties, the Wife did not work outside the home since the birth of the children. It was not until separation that she worked and then only part-time at the children's school. Her current ability to earn income will not meet the needs of her household.

The decree states, in pertinent part:

Commencing December 1, 2015, the Husband shall pay maintenance to the Wife in the amount of $4,000 per month. Maintenance shall be paid on the 1st day of each month. Maintenance shall continue until December 31, 2021 such monthly payments have been paid.

The Successor Trustee argues RCW 26.09.090 does not allow the court to consider Trust assets when determining maintenance obligations. RCW 26.09.090(1)

states, in pertinent part:

> In a proceeding for dissolution of marriage . . . , the court may grant a maintenance order for either spouse . . . . The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
>
> . . . .
>
>     (f) The ability of the spouse . . . from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse . . . seeking maintenance.[9]

The court did not order Matthew to pay maintenance using Trust income or assets. The court did not abuse its discretion in ordering Matthew to pay maintenance.

Matthew contends the court erred by ordering him to pay for Ginger to obtain a four-year college degree as part of the property division rather than as spousal maintenance. We agree. The court ordered Matthew to pay the cost of education as part of the property distribution. The decree of dissolution states Matthew "shall pay for the cost of Wife obtaining a [four]-year degree at her choice of Bellevue College or Western Washington University." The decree states the payments "shall not be characterized as maintenance." But RCW 26.09.090(1)(b) specifically identifies the "time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances" as a factor the court should consider in ordering maintenance. On remand, the court should also identify the time necessary to begin and complete the four-year degree.

4. Characterization and Valuation of Property

Matthew and the Successor Trustee challenge the characterization and valuation of property.

---

[9] Emphasis added.

We review the division of property for abuse of discretion. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). The trial court has "broad discretion in distributing the marital property" and its decision will be reversed only if exercised on untenable grounds or for untenable reasons. In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). "The trial court is in the best position to assess the assets and liabilities of the parties" and to determine what constitutes an equitable outcome. Brewer, 137 Wn.2d at 769.

The trial court's objective when dividing property is to divide and distribute the parties' property in a manner that is "just and equitable." RCW 26.09.080. RCW 26.09.080 requires the trial court to consider all relevant factors "including, but not limited to":

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage . . . ; and
> (4) The economic circumstances of each spouse . . . at the time
> the division of property is to become effective.

A just and equitable distribution does not mean the court must make an equal distribution. In re Marriage of DewBerry, 115 Wn. App. 351, 366, 62 P.3d 525 (2003).

As reflected in the Galando Asset Liability Spreadsheet, exhibit 43A, the court identified and assigned value to the separate and community property. Exhibit 43A identifies the Trust as Matthew's separate property. Consistent with the testimony of the Successor Trustee, the court valued the Descendant's Trust f/b/o Matthew at $5 million. The court valued Matthew's separate property interests in the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT at $3 million. The court valued the total community property at $1,059,445.

The court did not award any of Matthew's separate property to Ginger. The court awarded almost all of the community property to Matthew subject to an offsetting lien of $756,295. The findings of fact state, in pertinent part:

Under RCW 26.09.080, all property is before the court for a just and equitable distribution. Property acquired during marriage is presumed to be community property under RCW 26.16.030. A party asserting that property is separate has the burden of proving the separate property by clear and convincing evidence. With the exception of the trusts and limited family partnerships (listed in Exhibit 43a) and his post-separation property acquisitions, all property is characterized as community. The Court specifically finds that Respondent failed to prove his IRA account, bank accounts funded by insurance withdrawals, his business known as Amps NW, all prior business assets (such as truck, equipment, computers, inventory) and all household contents, vehicles, art and other miscellaneous property listed in the Decree are anything other than community property. These assets should be valued as set forth in the Petitioner's Asset and Liability Spreadsheet (Exhibit 43a).

Based upon the evidence at trial and testimony of the parties, the Court finds that all the property acquired during the parties' marriage is community property, with the exception of the following:

Petitioner's jewelry, clothing and personal effects;
Petitioner's Honda 4Trax and Kayak, which were gifts to her;
Respondent's jewelry, clothing and personal effects
Respondent's interests in Joseph & Barbara Galando Descendant's Trust f/b/o Matthew Galando
Respondent's interests in SDM Trust; Galando Gift Trust; Galando Family LP; Galando Hawaii LP; Galando House QPRTs

The parties in this marriage have been married since 2000 and residing together in a committed relationship with pooled financial resources and personal efforts for 4 years prior. This is a long-term marriage and the goal of the Court is to look forward and to seek to place the parties in an economic position where, working to their respective capacities and managing property awarded to them, they will be in roughly equal financial positions for the rest of their lives. . . .

Based upon the limited amount of property acquired, the allocation of debt and Respondent's extremely significant amount of separate property, the Court finds that it is fair and equitable to award the division of community property to the parties as set forth in Exhibit 43a, which will result in a marital lien owed to Petitioner by Respondent of $756,295.

Preliminarily, Matthew contends the court erred in finding a four-year committed intimate relationship before the marriage in 2000. A committed intimate relationship is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist. Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). Relevant factors establishing a committed intimate relationship include, but are not limited to, continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties. Connell, 127 Wn.2d at 346.

Substantial evidence supports finding a committed intimate relationship during the four years before the marriage. The record shows Matthew and Ginger lived together and pooled their resources for four years before they married. Ginger testified she moved into Matthew's South Seattle home three or four months after they met, they moved to California less than two years later, and they moved back to Washington in November 1999 before getting married in 2000. Ginger testified that before they got married, they both worked and pooled their resources. She paid the household bills, Matthew paid the mortgage, and they shared "equally" the expense for groceries.

Matthew contends the court erred by characterizing the Amps Northwest inventory, a Toyota Tundra, three paintings, firearms, ammunition, and a gun safe as community property.

A court's characterization of property as separate or community is a question of law subject to de novo review. In re Marriage of Skarbek, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). We review the findings of fact on which the court bases the characterization for substantial evidence. Skarbek, 100 Wn. App. at 447.

We presume property acquired during a marriage is community property. RCW 26.16.030; In re Marriage of Short, 125 Wn.2d 865, 870, 890 P.2d 12 (1995). We presume property acquired during a committed intimate relationship is community property. Connell, 127 Wn.2d at 350-51. A party may rebut these presumptions with clear, cogent, and convincing evidence. In re Marriage of Zahm, 138 Wn.2d 213, 223, 978 P.2d 498 (1999). A party does not satisfy the requirement of clear, cogent, and convincing evidence with self-serving declarations that he acquired the property using separate funds or showing that separate funds were available for that purpose. Berol v. Berol, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950). A party must trace the purchase of property to separate funds with some degree of particularity. Berol, 37 Wn.2d at 382. RCW 26.16.010 defines "separate property" as property acquired before marriage or acquired after marriage by gift, bequest, devise, or descent. RCW 26.16.010; Short, 125 Wn.2d at 870-71.

The court found Matthew did not carry his burden of showing the "IRA account, bank accounts funded by insurance withdrawals, his business known as Amps NW, all prior business assets (such as truck, equipment, computers, inventory) and all household contents, vehicles, art and other miscellaneous property" listed in exhibit 43A "are anything other than community property."

Matthew asserts the court erred in characterizing the Amps Northwest inventory as community property because he purchased the inventory with Trust income. Because Matthew produced no documentation to support his assertion, the court did not err in concluding Matthew did not overcome the presumption of community property.

Matthew argues the Toyota Tundra is separate property because he purchased it during the marriage with proceeds from the sale of a Corvette he owned before he met Ginger. Because Matthew presented no evidence related to the purchase of the Toyota from the sale of the Corvette, the court did not err in concluding it was community property.

The court characterized three paintings as community property. The court awarded one painting to Matthew valued at $55,000 and two paintings to Ginger valued at $60,000 and $15,000. Matthew argues the two paintings are separate not community property because he purchased them before he married Ginger. Matthew states that he gave Ginger the "rose" painting valued at $15,000 as a gift.[10] Ginger testified Matthew purchased the two paintings for her as a gift after they were engaged. On remand, the court shall determine whether the paintings were purchased during the relationship and which, if any, of the paintings should be characterized as gifts.

Matthew argues some of the firearms and ammunition are separate property. The undisputed evidence shows Matthew purchased a Glock, MAC-90, UZI A-2, AK-47, and ammunition before he met Ginger. Matthew testified his grandfather gave him a Browning .380 as a gift. The court erred by characterizing these items as community property.

Matthew also argues the gun safe is his separate property because Ginger gave it to him as a gift. Ginger concedes this issue on appeal. Because the gun safe was a gift, the court erred by characterizing the gun safe as community property.

Matthew challenges the valuation of the Amps Northwest inventory. A court has broad discretion in valuing property in a dissolution action and we will not reverse

---

[10] And at oral argument, Matthew conceded one of the paintings was a gift to Ginger.

valuation absent manifest abuse of discretion. In re Marriage of Gillespie, 89 Wn. App. 390, 398-99, 948 P.2d 1338 (1997). A court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Muhammad, 153 Wn.2d at 803. A court does not abuse its discretion if the valuation of property is within the scope of the evidence. In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982).

The court valued the Amps Northwest inventory at $150,000. Substantial evidence supports the valuation. Ginger testified the Amps Northwest inventory was worth $150,000 based in part on an April 18, 2011 inventory. The court admitted the inventory into evidence. The inventory shows Amps Northwest had a total retail value in 2011 of $90,695. Ginger testified about the additional equipment Matthew acquired between 2011 and 2014. Matthew argues the value of the Amps Northwest inventory diminished as it aged after the business ended in 2013. Matthew argues the court should have relied on the total replacement value of the inventory in 2011 of $50,571. The decision to rely on retail value rather than replacement value is within the broad discretion of the court. The evidence supports the decision to value the Amps Northwest inventory at $150,000.

The Successor Trustee disputes the valuation of Matthew's interest in the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT at $3 million.[11] The valuation is within the scope of the evidence.

___

[11] Matthew also challenges the valuation of the SDM Trust. Ginger contends the Successor Trustee lacks standing to challenge the valuation of the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT. Because the record shows that Matthew's Trust has an interest in the assets of the SDM Trust, Galando Gift Trust, Galando Family LP, Galando Hawaii LP, and Galando House QPRT, the Successor Trustee has standing to challenge the valuation of the assets of those trusts and partnerships. See Retail Store Emps. Union, Local 1001 v. Wash. Surveying & Rating Bureau, 87 Wn.2d 887, 894, 558 P.2d 215 (1976).

The record shows Matthew owns a one-third interest in Galando Hawaii LP. The "Matthew Galando Investment Report" for June 2014 to 2015 shows the Galando Hawaii LP is valued at approximately $9.7 million, which is more than the combined valuation of $3 million for the family trust assets and partnerships.[12] The court did not abuse its discretion in valuing the trust and partnership assets at $3 million.

### 5. Lien

The Successor Trustee contends the court erred by ordering Matthew to sell the house and pay the community property lien from the proceeds of the sale.

In the decree of dissolution, the court ordered payment of the lien "shall be made from sale proceeds of residence located at 6124 - 224th Avenue NE, Redmond, WA." The findings of fact and conclusions of law state, in pertinent part:

> The Court has the authority to order the prompt sale of the "Trust Residence," which testimony by both the Successor Trustee and Husband indicate was underway. With no evidence of any substantial progress being made on that transaction/listing, and the Court having the authority to protect the interests of the beneficiary children of this marriage, the house shall be listed for sale within 60 days, no later than 1/18/2016.[13]

The Successor Trustee argues the Trust holds the title to the house and the spendthrift Trust provision prevents the court from ordering payment of the lien from proceeds from the sale of the house. The Trust states, "Neither the principal nor the income of [the Trust] .... shall be liable for the debts of any beneficiary . . . , nor shall the same be subject to seizure by any creditor." As a general rule, a spendthrift trust

---

[12] The Matthew Galando Investment Report for June 2014 to 2015 also states the "BJG & JAG Descendants Trust FBO Matthew Galando owns 32.106% of [Galando Investments LP]" with a net worth of $1,421,713. The Successor Trustee testified the JAG Gift Trust has a value of "3.9 million" dollars and one-third of the trust will pass to Matthew upon the death of his mother. The Galando House QPRT deed states a value of $440,005. Although Matthew argues he quitclaimed his interest in the Galando House QPRT in March 2014, he did not provide documentation to support his argument.

[13] Emphasis added.

prevents attempts by creditors to reach the trust assets and income. RCW 6.32.250; RCW 11.96A.190; Seattle First Nat'l Bank v. Crosby, 42 Wn.2d 234, 243, 254 P.2d 732 (1953); RESTATEMENT (THIRD) OF THE LAW OF TRUSTS § 58(1) (AM. LAW INST. 2003).

The undisputed testimony of the Successor Trustee and Matthew established they planned to list the house for sale for approximately $2.3 million. The Successor Trustee testified they "[f]ully intend to" sell the family home "promptly after all the repair work is done." The undisputed testimony established Matthew planned to list the house for $2.3 million.

The court had the authority to require Matthew to pay the lien from the proceeds of the sale of the house to ensure he complied with the court's order. In re Marriage of Mathews, 70 Wn. App. 116, 126, 853 P.2d 462 (1993). The unchallenged findings establish Matthew "displayed a pattern of intransigence, violation of court orders, and dissipation of assets." The court found, in pertinent part:

> Throughout this matter the Respondent has displayed a pattern of intransigence, violation of court orders, and dissipation of assets. His refusal to disclose relevant financial information and to admit to his violation of the court orders has resulted in unnecessary fees and costs being incurred by Petitioner. She has received some awards of attorney fees, but they did not cover all the fees and costs incurred. Petitioner was forced to borrow against one of the only community assets (Insurance Policy #7177) to meet some of her legal expenses. Respondent demanded equal distributions, although he failed to disclose his pre-separation withdrawal of substantial funds from the other insurance policy and also failed to fully disclose his ample financial resources. Respondent should be required to repay all the funds loaned from the Insurance Policy #7177 as part of the fees awarded to Petitioner.

We also note that where, as here, the beneficiary of a trust has the power to compel distribution of trust income and assets, a spendthrift provision cannot shield trust income and assets. See RESTATEMENT (THIRD) OF THE LAW OF TRUSTS § 58(1) cmt.

31

b.[14] The evidence established Matthew had sole authority to distribute Trust income and assets.[15] The Successor Trustee contends Matthew did not have the equivalent of ownership because Matthew's role as trustee was "limited by an ascertainable standard" for his "health, education, support, or maintenance." The evidence shows Matthew ignored that standard. The record supports the order requiring Matthew to sell the house and pay the lien from the proceeds of the sale.

## Award of Attorney Fees

The Successor Trustee contends the court erred by awarding Ginger attorney fees based on Matthew's "substantial financial resources . . . , including his trust income." The court found, in pertinent part:

> Respondent has substantial financial resources available to him, including his trust income, investment income, and gifts from his family. He has the ability to pay for Petitioner's fees and costs incurred in this matter. With the sale of the Trust Residence, there will be ample resources available to Respondent for payment of these obligations.

We review an award of attorney fees for abuse of discretion. Scott Fetzer Co., Kirby Co. Div. v. Weeks, 122 Wn.2d 141, 147, 859 P.2d 1210 (1993). Because Matthew testified he had the discretion to use Trust income to pay attorney fees, the court did not abuse its discretion in awarding attorney fees.

---

[14] Comment b(1) to Restatement (Third) of the Law of Trusts § 58(1) states, in pertinent part:
An intended spendthrift restraint is also invalid with respect to a nonsettlor's interests in trust property over which the beneficiary has the equivalent of ownership, entitling the beneficiary to demand immediate distribution of the property. Thus, if an income beneficiary also holds a presently exercisable general power of appointment (that is, a power currently to compel distribution of trust property to the power holder), a spendthrift restraint will not prevent the beneficiary's creditors or transferees from reaching the property that is subject to the power.

[15] The Successor Trustee testified that Matthew's monthly Trust disbursements to himself were "somewhere of a range about 16,000 a month."

Attorney Fees on Appeal

Ginger seeks an award of attorney fees for responding to the Successor Trustee's appeal. RAP 18.1(a) entitles a party to reasonable fees and costs if an applicable law grants that right. "[T]he appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." RCW 26.09.140. We exercise our discretion and deny the request to award attorney fees to Ginger on appeal.

We affirm in part, reverse in part, and remand. On remand, the court shall determine and characterize gifts as separate not community property, include the payment of tuition as part of maintenance and specify an end date for those payments, and strike the parenting plan provision restricting residential time if Matthew has any contact with the police.

WE CONCUR:

Trickey, ACJ

Cox, J.

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2017 AUG 28 AM 9:48