IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SIMON J. HALL,<br><br>　　　　　　Appellant,<br><br>　　　　v.<br><br>ALERIAN A. HALL (NKA Lockwood),<br><br>　　　　　　Respondent. | No. 86131-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Simon Hall and Alerian Hall, now Lockwood,[1] were married in July 2010. They had two children, M.H. and L.H. In February 2022, the parties separated, and Hall subsequently filed for dissolution. After a trial, the court awarded Lockwood the family home, 59 percent of the total property, and spousal maintenance. The trial court also designated Lockwood as the parent with whom the children reside a majority of their time and ordered that each parent is to pay their pro rata share of the children's post-secondary educational expenses. Additionally, the court credited "[a]ny funds from [the children's college savings accounts] . . . to the parent who contributed the funds into the accounts (or whose family contributed the funds)." Hall challenges the trial court's division of assets in favor of Lockwood, the maintenance award, and its decision regarding the children's post-secondary education. Lockwood seeks appellate attorney fees.

---

[1] Because the parties had the same last name during marriage, we will refer to Alerian by her current name, Lockwood, for clarity.

We affirm with one exception. Because the parties agree that the children's college savings accounts belong to the children, crediting payments to the parent whose family contributed to the respective accounts has the effect of treating them as separate property, and the trial court erred in doing so. We reverse on this limited issue and remand to the trial court to remove the language that credits funds from the children's college savings accounts to the parent who contributed, or whose family contributed, the funds into the accounts. We otherwise affirm the trial court's division of property and award of spousal maintenance and we award Lockwood appellate attorney fees.

FACTS

Simon Hall and Alerian Lockwood were married in July 2010. After more than eleven years of marriage, Hall filed for dissolution in February 2022. The parties share two children, M.H., born in 2013, and L.H., born in 2016. Both children have special needs. Prior to their marriage, Lockwood worked as a financial advisor. At the start of their marriage, in 2010, Hall worked as a software engineer for Microsoft, and Lockwood attended law school and subsequently opened her own law firm doing estate planning. In 2018, after the births of M.H. and L.H., "[Lockwood and Hall] made a decision mutually for [Lockwood] to leave her practice . . . so she could be home with [L.H.]." Lockwood then "took on the home and childcare role," which allowed Hall to "earn the significant income that support[ed] the family."

Additionally, Lockwood testified that she was diagnosed with "different things that are all types of peripheral neuropathy," which she explained "encompasses carpal tunnel and ulnar nerve entrapment." Specifically, Lockwood testified that she was diagnosed with unspecified polyneuropathy, which she described as causing her "hands

to start seizing up and clawing up," and a "combination of problems and numbness, coldness, pain." Lockwood explained that the symptoms began in her hands shortly after she started law school and that her symptoms increased to the point that she needed accommodations in law school and needed "someone [to] do dictation for me," and that she would use "dictation software that [Hall] purchased" for her. Further, Lockwood explained that after her separation from Hall, she did not have "extra added pain" but that her symptoms and pain remained. At the time of dissolution, Hall was working for Google and Lockwood was unemployed but planning to go back to school and open her own landscape design business.

On October 11, 2023, after six days of trial, the trial court entered findings of fact and conclusions of law, a dissolution decree, a parenting plan, and a child support order. In the parenting plan, the trial court imposed a phased residential schedule wherein Lockwood had the majority of time with the children, but allowed Hall's time to increase steadily. In the dissolution decree, the trial court distributed 59 percent of the total property to Lockwood and 41 percent to Hall, laying out its distribution in an attached asset liability and distribution list. The parties' net assets at the time of dissolution amounted to $6,394,924. The court distributed to Lockwood $3,649,425 in community property and $141,072 of separate property, totaling $3,790,497. It distributed to Hall $1,273,713 in community property and $1,330,713 in separate property, totaling $2,604,426.

Lockwood's community property distribution included the family home valued at $1,450,000, all of Fidelity account 8947, a portion of Fidelity account 7415 valued at $800,000, and a portion of Google stock valued at $867,000. Lockwood's separate

property award included a retirement account valued at $125,473, a bank account valued at $4,592, and personal property valued at $11,008. Hall's community property award included a portion of Fidelity account 7415 valued at $81,739.02 and a portion of Google stock valued at $961,113.[2] Hall's separate property award included a condominium valued at $450,000, a portion of Google stock valued at $441,657, a portion of a Microsoft retirement account valued at $359,427.98, a portion of a Google retirement account valued at $32,552.53, and a bank account valued at $38,024.32. In its findings, the trial court explained that its division of the real property was "designed to provide financial and location security for Ms. Lockwood and the children into the future." Further, the dissolution decree required Hall to pay Lockwood spousal maintenance in the amount of $10,000 per month for two years and then in the amount of $8,000 per month for three years thereafter.

Further, in the child support order, the trial court ordered the parents to pay for the children's post-secondary education proportionately "based on their incomes at that time" and specified that "[a]ny funds from 529 or comparable accounts for the children shall be credited to the parent who contributed the funds into the accounts (or whose family contributed to the funds)." Lockwood and Hall have six savings accounts intended to support the children's educational expenses. In its corresponding asset and liability distribution, the trial court identified four accounts, Fidelity UTMA accounts 8606 and 9302 and my529 plan accounts 4892 and 9529, as Lockwood's separate property.

---

[2] Hall and Lockwood's community property distribution also included various other investments, retirement funds, bank accounts, and personal property. The parties do not dispute the distribution of these assets.

The trial court also marked two Vanguard 529 plan accounts, one for M.H. and the other for L.H., as Hall's separate property.

On October 23, Lockwood filed a motion for reconsideration of the October 11 orders requesting the trial court to (1) correct a discrepancy in the duration of spousal maintenance awarded, (2) correct an error denoting to which accounts Lockwood's family contributed, and (3) clarify how accounts should be divided to fairly distribute interest and market gains and losses.[3] On November 27, the trial court granted Lockwood's motion in part. In particular, it granted Lockwood's request to correct the discrepancy in the duration of spousal maintenance to reflect five years and specified that Lockwood's family had contributed to "the my529 Utah plans for each child [ ] and the children's Fidelity UTMA accounts." Further, the court clarified that Lockwood would receive, as community property, 90.7 percent of Fidelity account 7415 and 38.19 percent of the Google stock, and Hall would receive, as community property, 9.27 percent of the Fidelity account 7415 and 42.34 percent of the Google stock and, as separate property, an additional 19.4 percent of the Google stock.[4] On November 30, 2023, to reflect these changes, the trial court entered an amended order on reconsideration and a second amended dissolution order with an amended asset liability and distribution list.

Hall timely appeals and Lockwood cross-appeals.[5]

---

[3] Lockwood raised other issues unrelated to this appeal pertaining to the deadline for the parties to complete paperwork and when Hall should remove his belongings from the family home.

[4] The accounts were valued as of November 1, 2023. The trial court also clarified the distribution of other retirement and savings accounts not at issue here.

[5] Although Lockwood filed a cross-appeal the notice she filed appeals the same orders specified in Hall's notice and her briefing does not indicate any appeal to any other orders or findings.

DISCUSSION

Hall challenges the trial court's property division award in favor of Lockwood as unjust and inequitable, particularly the fact that Lockwood received a majority of the community property and a portion of Hall's separate property. He also disputes the trial court's decision to credit the children's college savings accounts to Lockwood while still requiring a pro rata split of college expenses. He further challenges the trial court's award of spousal maintenance to Lockwood, arguing that viewing the property and maintenance awards together, they are unjust and inequitable.

I.  Property Division

On appeal, the court reviews the trial court's distribution of property in a dissolution proceeding for an abuse of discretion. In re Marriage of Neumiller, 183 Wn. App. 914, 920, 335 P.3d 1019 (2014). A trial court abuses its discretion when its decision is based on untenable grounds or for untenable reasons. Id. at 920. In a dissolution proceeding, RCW 26.09.080 guides a trial court's distribution of assets and liabilities. The court will distribute property "either community or separate, as shall appear just and equitable." RCW 26.09.080. The character of property—though not controlling—must be contemplated before property can be distributed. In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). An asset is considered "separate property" when it is "acquired before marriage; acquired during marriage by gift or inheritance; acquired during marriage with the traceable proceeds of separate property; or, in the case of earnings or accumulations, acquired during permanent separation." In re Marriage of White, 105 Wn. App. 545, 550, 20 P.3d 481 (2001). Further, an "asset is

community property if it is not separate property, which generally means that an asset is community property if acquired onerously during marriage." Id.

A just and equitable distribution contemplates four non-exclusive factors:

(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage of domestic partnership; and
(4) The economic circumstances of each spouse or domestic partner at the time the division of the property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

RCW 26.09.080. The trial court's discretion to distribute property and liabilities is broad because it is "in the best position to assess the assets and liabilities of the parties" to ascertain what is just and equitable. Brewer, 137 Wn.2d at 769.

### A. Characterization and Distribution of Fidelity account 7415

Hall contends that the trial court's property distribution did not adequately characterize the assets and was not just and equitable. In particular, he contends that Lockwood's community property award "is nearly three-times" his own community property award, which he attributes, in part, to the trial court's erroneous characterization of Fidelity account 7415 as wholly community property.[6]

When determining the character of property, the trial court considers the date of acquisition of the property. In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932

---

[6] Lockwood argues that Hall's claim to the characterization of property is unpreserved because he did not argue that Fidelity account 7415 was separate property and cannot now argue so on appeal. "[T]he trial court's duty to characterize a particular asset of community or separate property only arises where the issue is presented at trial" and may be waived if not appropriately raised. In re Marriage of Wright, 179 Wn. App. 257, 264, 319 P.3d 45 (2013) (declining to consider one party's claim that the accounts receivable was separate property pursuant to RAP 2.5(a) because that party did not raise the issue at trial). Here, Hall's proposed asset distribution list, and his trial brief, both state that the Fidelity account is mostly separate property and should be distributed to him. This was sufficient to raise the issue of the character of the account before the trial court.

(2009). In general, courts will characterize property as community rather than separate property absent clear indications of its character. Brewer, 137 Wn.2d at 766-67. Thus, separate property will remain separate "through all of its changes and transitions as long as it can be traced and identified." In re Marriage of Watanabe, 199 Wn.2d 342, 351, 506 P.3d 630 (2022). The party claiming the property is separate must "clearly and convincingly trace [it] to a separate source." In re Marriage of Shui & Rose, 132 Wn. App. 568, 584, 125 P.3d 180 (2005). If it is established that the property is separate, "a presumption arises that such property remains separate property absent direct and positive evidence of intent to convert to community property." Watanabe, 199 Wn.2d at 351; Borghi, 167 Wn.2d at 484-85 ("the evidence must show the intent of the spouse owning the separate property to change its character"). The party asserting that separate property has transferred to the community has the burden of proving the transfer by clear and convincing evidence. In re Marriage of Skarbek, 100 Wn. App. 444, 448, 997 P.2d 447 (2000), abrogated on other grounds by, Watanabe, 199 Wn.2d 342 (2022).

The appellate court reviews the characterization of property de novo and factual findings supporting that characterization, "including time of acquisition, method of acquisition, and intent of donor," for substantial evidence. Watanabe, 199 Wn.2d at 348-49. " 'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). While reviewing courts consider the trial court's characterization of property to determine whether it abused its discretion, the ultimate question is whether

the property division is just and equitable. In re the Marriage of Groves, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019).

The trial court listed Fidelity account 7415 as community property with a $800,000 distribution to Lockwood and a $81,739.02 distribution to Hall. Hall claims it was error to treat Fidelity account 7415 as community property without making a finding characterizing it as such. In particular, Hall claims on appeal that "it is not apparent that the trial court was even aware that it was awarding Lockwood nearly one-third of Hall's separate property," pointing to his own proposed asset division, which "characterized the [Fidelity 7415] account as $144,623.08 community and $717,552.95 separate." However, RCW 26.09.080 does not explicitly require a trial court to explain its findings regarding the characterization of property, nor does it require property "be specifically designated or labeled"; the court need not "characterize each piece of property." Stokes v. Polley, 145 Wn.2d 341, 347, 37 P.3d 1211 (2001). In any case, here, even if it did not explain its finding, the trial court rejected Hall's proposed asset division and instead characterized Fidelity account 7415 as wholly community property.

The trial court's characterization of Fidelity account 7415 as community property must be supported by substantial evidence. See In re Marriage of Wright, 179 Wn. App. 257, 262, 319 P.3d 45 (2013). As the party claiming the property as separate, Hall had to "clearly and convincingly trace [it] to a separate source." Shui, 132 Wn. App. at 584. Here, Lockwood initially acknowledged that each party had separate accounts—without specifying which accounts—at the time of their marriage. Further, Hall's investment reports list Fidelity account 7415 as "Simon Hall – Individual TOD." Fidelity account 7415 is significantly comprised of Microsoft stock. Hall testified that he worked at

Microsoft from 1999 until 2012, so he was a Microsoft employee for the first two years of his marriage to Lockwood. At oral argument, Hall's counsel acknowledged that although he had not provided tracing of Fidelity account 7415, the tracing provided for a Microsoft 401(k) retirement account that accrued during Hall's tenure at Microsoft indicates that Fidelity account 7415 could be traced to be Hall's separate property before the marriage.[7] Hall's proposed asset distribution designated Fidelity account 7415 as his property, distributing $717,552.95 to himself as separate property and $144,623.08 to himself as community property.[8] Thus, the record contains clear and convincing evidence that Fidelity account 7415 contained separate property, even though Hall did not provide the type of tracing he did for the Microsoft 401(k) to define what amount he characterized as separate property from the date of their marriage.

As the party asserting that separate property transferred to the community, Lockwood had the burden of proving the transfer by clear and convincing evidence. See Skarbek, 100 Wn. App. at 448. Lockwood's proposed asset distribution designated Fidelity account 7415 as wholly community property, distributing $830,000 to herself and $51,739.02 to Hall. At trial, she explained that her request for the funds from Fidelity account 7415 was because "it is money that [she] [ ] managed over time" that she would need for home repairs. Hall points out that Lockwood never asserted that Fidelity account 7415 was so commingled as to change its character and has not demonstrated any intent by Hall to transfer the funds to the community. The record does

---

[7] Wash. Court of Appeals, oral argument, In re Marriage of Hall, No. 86131-0-I (May 30, 2025), 20 min., 20 sec. to 21 min., 30 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025051199/?eventID=2025051199.

[8] Hall used this same allocation in his trial briefing. However, Hall does not explain how he calculated the split of community and separate property.

not show positive or direct evidence that Hall intended to transfer the stock acquired *before* his marriage to the community. The record established that Hall continued to add to the account after marriage, so the total amount was not entirely attributable to the growth of the initial separate property. However, neither party provided evidence as to what specific amount was traceable to Hall's initial separate property. We conclude that there is not substantial evidence supporting the trial court's finding that Fidelity account 7415 was *wholly* community property.

However, despite the trial court's mischaracterization of Fidelity account 7415 as wholly community property, we consider whether the property distribution nevertheless was just and equitable. A trial court's mischaracterization of property is "rarely a proper basis to reverse the court's property distribution . . . because the dispositive inquiry of the court's property distribution is that the court's decision" was just and equitable. In re Marriage of Zier, 136 Wn. App. 40, 46, 147 P.3d 624 (2006). A trial court is not required to award separate property to its owner. In re Marriage of Larson & Calhoun, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). RCW 26.09.080(4) authorizes a trial court to consider the "economic circumstances" of each party. A just and equitable property distribution does not require the court to make an equal distribution, but rather seeks " 'fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.' " Larson, 178 Wn. App. at 138 (quoting In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)).

We will remand when the trial court's division was significantly influenced by the characterization and when it is unclear that, assuming a proper characterization, the

court would have divided it the same way. In re Marriage of Schwarz, 192 Wn. App. 180, 192, 368 P.3d 173 (2016). Here, the court treated Fidelity account 7415 as community property and distributed $800,000 to Lockwood and $81,739.02 to Hall. Hall challenges the property distribution as a whole, in which Lockwood received "59% of the total property, or 70% of the community property *and* almost one-third of Hall's separate property," while he received "just one-quarter of the parties' community property, especially where his own separate property still brings his total award to far less than 50% of the total property."

In its amended findings of fact and conclusions of law, the trial court concluded that the parties' division of real property, community personal property, and separate personal property was "fair (just and equitable)." In so concluding, the trial court found the parties 11.5-year marriage was not "a long-term marriage." It also found that Lockwood closed her law practice to care for the children and was the primary parent during the marriage and during the separation. She took on the core household activities—paying bills, childcare, making food, planning trips, and managing the home. Further, the court found that Hall was "a successful tech worker, who per his financial declaration has a total gross monthly income of $31,794.56 per month," and that despite having previously worked as a financial advisor and obtaining her law degree, Lockwood had since let her bar membership lapse and was "no longer interested in practicing law." Moreover, even while practicing law, Lockwood made "less than $30,000 in 2017." Hall does not dispute these findings as they pertain to the property

division award.[9] Unchallenged findings are verities on appeal. <u>Watanabe</u>, 199 Wn.2d at 349.

The record does not indicate that in dividing the property, the trial court was significantly influenced by the characterization of the Fidelity account 7415. Even if it awarded less of the Fidelity account 7415 to Hall than he had proposed, it also awarded Lockwood less of that account than she requested,[10] and the disparate overall distribution was otherwise supported by the court's findings. We conclude that given the trial court's broad discretion to make a property division that contemplates the circumstances of the parties, even if Fidelity account 7415 was partially separate, the court did not abuse its discretion in distributing it as it did to reach a just and equitable distribution.

### B. College Accounts

In its amended asset liability and distribution list, the trial court "credited" the Fidelity UTMA and my529 plan accounts for each child to Lockwood and the Vanguard 529 Plan for each child to Hall.[11] In its amended child support order, the court ordered that each parent must pay for their "proportionate share, based on their incomes at that time."[12] In its order granting partial reconsideration, it clarified,

---

[9] Hall does challenge some of these findings. For instance, he challenges the finding that Lockwood was unable to make $4,000/month. He also claims the finding that Lockwood made less than $30,000 in 2017 was incomplete because she was working only part-time. He challenges these findings only as they pertain to the spousal maintenance award. In any case, these findings do not demonstrate that the court's property division was influenced by the characterization of the Fidelity account 7415.

[10] The amount was less by a slim margin.

[11] We refer to the children's college savings accounts collectively as the "529 accounts."

[12] The order explains that each parent's share is "based on the published price for an in-state student living on campus at the University of Washington [(UW)] for tuition, books, fees, transportation, room, board, personal expenses, health insurance premiums, and uninsured medical costs." In his reply brief, Hall purported to "accept [Lockwood's] apparent concession that his proportional share would be determined by UW cost of attendance." And at oral argument, Hall asked this court to recognize that the trial court's reference to the cost of attending the UW is a cap on what either party will pay. Wash. Court of Appeals, oral argument, <u>In re Marriage of Hall</u>, No. 86131-0-I (May 30, 2025), 1 min., 10 sec. to 1 min.,

> Any funds from 529 or comparable accounts for the children shall be credited to the parent who contributed the funds into the accounts (or whose family contributed the funds). The accounts from [Lockwood's] family are the my529 Utah plans for each child [ ] and the children's Fidelity UTMA accounts [ ]. Vanguard 529 plans are to be used by [Hall] to contribute his share of post-secondary expenses for the children of the marriage.[13]

Lockwood testified that it was primarily her parents who funded the Fidelity UTMA and my529 plan accounts but that she contributed a small amount and that she believed the Vanguard 529 accounts were fully funded by Hall's family. Lockwood's mother, Eileen Lockwood, testified that the money was to aid with the children's educational expenses. Lockwood also testified that the accounts were "intended for education" and were "given to the children in the children's names," but that she thought the accounts were separate property. The Fidelity UTMA and my529 plan accounts credited to Lockwood are valued at $729,253.69, and the Vanguard 529 accounts credited to Hall are valued at $18,690.91.

Hall challenges as "grossly inequitable" the trial court's crediting the children's 529 accounts to the party whose family contributed to the account without accounting for it in the overall property division award.[14] Hall "does not challenge the support amount or the proportional sharing of education expenses, per se." Trial courts have broad discretion to order support for postsecondary education. In re Marriage of Cota,

---

55 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025051199/?eventID=2025051199. However, as Hall did not expressly raise the issue of whether the trial court's order set a cap on the party's payment obligations, we decline to address Hall's request as not properly before us in this appeal.

[13] In the amended asset and liability distribution list, the court noted that the Fidelity UTMA and my529 plan accounts were to be used by Lockwood for her share of the children's education.

[14] Hall does not challenge the court's determination of which family contributed to which of the children's college accounts.

177 Wn. App. 527, 536, 312 P.3d 695 (2013).[15] He does, however, challenge "the court's decision crediting the accounts to Lockwood in a way that allows her to use the $730,321 exclusively for her share of post-secondary support."[16]

Both parties agree that the 529 accounts belong to the children and are for the children's benefit.[17] Further, they do not challenge the court's treatment of the children's 529 accounts as neither parent's separate property nor as community property for purposes of distributing their assets. In the Marriage of Sinopole supports the conclusion that the trial court did not abuse its discretion when it "deemed these accounts belonged to the children and did not distribute them." No. 51048-1-II, slip op. at 18 (Wash. Ct. App. Aug. 20, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051048-1-II%20Unpublished%20Opinion.pdf.[18] In Sinopole, the trial court determined that various bank accounts were owned by the children and, thus, were not marital property to be distributed. No. 51048-1-II, slip op. at 18. Therefore,

---

[15] "When considering whether to order support for postsecondary educational expenses, the court shall determine whether the child is in fact dependent and is relying upon the parents for the reasonable necessities of life." RCW 26.19.090(2). Trial courts have discretion to determine "whether and for how long to award postsecondary educational support." Id. In making this determination, the trial court considers factors such as the "[a]ge of the child; the child's needs; the expectations of the parties for their children when their parents were together; the child's prospects, desires, aptitudes, abilities or disabilities; the nature of the postsecondary education sought; and the parents' level of education, standard of living, and current and future resources . . . [and] the amount and type of support that the child would have been afforded if the parents had stayed together." RCW 26.19.090(2).

[16] Specifically, Hall contends that the trial court's order requires him to pay significantly more than Lockwood, despite having less money credited to him from the children's college savings accounts. Hall uses the UW as an example, noting that the total cost or attending UW "is currently $34,554, per year or $138,216 for four years of undergraduate school." He states that if both children attended UW, Lockwood would owe $55,286 and would have "a windfall of $675,035 left in the children's accounts," whereas he would owe $221,146, less his parent's $18,690, totaling $202,456.

[17] Wash. Court of Appeals, oral argument, In re Marriage of Hall, No. 86131-0-I (May 30, 2025), 2 min., 30 sec. to 2 min., 54 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025051199/?eventID=2025051199 (Hall's concession); Wash. Court of Appeals, oral argument, In re Marriage of Hall, No. 86131-0-I (May 30, 2025), 8 min., 40 sec. to 8 min., 55 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025051199/?eventID=2025051199 (Lockwood's concession).

[18] Under GR 14.1(c), we may cite to unpublished decisions as necessary for a reasoned opinion.

"their valuation [wa]s immaterial" to the distribution of marital property. Id. Here, similarly, even though the named custodian of each account is a parent, the respective grandparents' intent in contributing to these accounts was to benefit their grandchildren, not to gift the amounts to their respective child, i.e., to the parent.[19] Thus, the trial court acted within its broad discretion to order that the parents contribute to the children's education in proportion to each parent's future income, and properly excluded the accounts from either parent's overall property distribution.

Nevertheless, Hall claims that the court erred by improperly crediting the children's college savings accounts to the parent whose family contributed to the account.[20] We agree that the court erred by doing so.

Boisen v. Burgess is instructive as an example of how courts handle third-party payment of college expenses in relation to the parents' obligations. 87 Wn. App. 912, 943 P.2d 682 (1997). There, the parents had a dissolution agreement that required the father to pay "one-half of the children's expenses, and that someone else would pay the other half." Id. at 921. Subsequently, the mother remarried, and her second husband paid for 100 percent the children's college expenses. Id. at 921. The father claimed that he was required to pay one-half of the children's college expenses less payments made by third parties. Id. at 920. The mother claimed that despite the fact that the payment had been made from her and the second husband's community property, the father was required to pay one-half without credit or deduction for payments made by third parties,

---

[19] Lockwood is listed as the account owner of the my529plan accounts held for the benefit of M.H. and L.H and as the custodian for Fidelity UTMA accounts for M.H. and L.H. Similarly, the Vanguard 529 plans to which Hall's parents contributed were in Hall's name.

[20] This is evidence that supports the trial court's award. However, Hall does not challenge the designation of who contributed to which of the children's college accounts.

and that the father should reimburse her. Id. at 916, 921. The trial court ruled that each party would be credited with one-half of what the third party had paid. Id. at 921. The appellate court affirmed the trial court's findings that the mother and the second husband were "living separate and apart" when he made the payments. Id. at 919. Therefore, the payments for the children's education came out of his separate property, not their community property. Id. Moreover, the court reasoned that when the parents entered into the separation agreement, "they clearly intended that [the father] would pay one-half the children's college expenses, and that someone else would pay the other half." Id. at 921. Further, "[a] necessary corollary was that third-party payments covering *all* (100%) of the children's college expenses would be credited one half to [the father], and one half to whoever was obligated to pay the remainder of the college expenses." Therefore, although the father never paid his share, the third party's payment, as credited to him, satisfied his obligation to pay college expenses. Id.

Unlike in Boisen, where the court credited the parents according to their obligation after a third party voluntarily paid all of the children's expenses out of his separate property, here, the trial court imposed the obligation to pay for postsecondary education only on the parents, not on the children.[21] Because both parties agree the children are the owners of the 529 accounts, the court abused its discretion by effectively treating the accounts as the separate property of the parent whose own parents (the children's grandparents) had contributed to the fund. Instead, the parties agree the 529 accounts belong to the children; therefore, any payments from the

---

[21] Hall asked the trial court to require the 529 accounts be exhausted before either party was required to pay their pro rata share out of pocket. While the trial court could have done so, it did not abuse its discretion solely by not adopting this request.

accounts should not be credited to *either* parent. Thus, we reverse the court's child support order to the extent it credited each parent based on payments from the 529 accounts and remand for the court to remove this language. We otherwise affirm the property distribution between the parents and the order requiring the parents to split the cost of postsecondary education "based on their incomes at that time."

II. Spousal Maintenance

Hall contends that the amount and duration of the trial court's spousal maintenance award is unjust and inequitable. Notably, Hall does not claim that the trial court abused its discretion by failing to consider any of the requisite factors, but rather suggests that its findings are not supported by substantial evidence. Specifically, he challenges the trial court's findings pertaining to Lockwood's ability to earn an income and that the amount exhausts his monthly take home pay. We disagree.

RCW 26.09.090 guides a trial court in its decision of whether to award spousal maintenance. Spousal maintenance is "a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." In re Marriage of Washburn, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). However, spousal maintenance is not awarded as a matter of right, but is discretionary. In re Marriage of Mueller, 140 Wn. App. 498, 510, 167 P.3d 568 (2007). A trial court may order maintenance "in such amounts and for such periods of time as the court deems necessary" after considering six non-exclusive factors:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
(c) The standard of living established during the marriage or domestic partnership;
(d) The duration of the marriage or domestic partnership;
(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1). Trial courts have broad discretion to award maintenance, and an award will not be overturned on appeal absent a showing of manifest abuse of discretion, such as when the decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Wilcox, 3 Wn.3d 507, 517, 553 P.3d 614 (2024). We review a trial court's findings of fact in support of a maintenance award for substantial evidence. In re Marriage of Leaver, 20 Wn. App. 2d 228, 238, 499 P.3d 222 (2021). " 'Maintenance not based on fair consideration of the statutory factors constitutes an abuse of discretion.' " Wilcox, 3 Wn.3d at 521 (quoting In re Marriage of Anthony, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019)).

Hall first challenges the duration of maintenance the trial court ordered—five years—as being unjust considering that their marriage was a mid-length marriage and that he had been paying expenses post-separation for both parties. He points to the parties' temporary agreement that ordered him to deposit all income and rental income into a joint account until spousal maintenance was awarded, which he claims was effectively maintenance.

However, the record indicates that the trial court considered the 11.5-year length of their marriage as required by RCW 26.09.090(1)(d). Further, as Lockwood contends,

Hall "did not oppose maintenance and proposed $7,000 per month for four years provided asset division was fair and equitable." And in his response to Lockwood's motion for reconsideration, Hall stated, "[t]he decision for five years of support, I feel, rightly considered the duration of our marriage and the specific circumstances leading to our separation, as well as post separation expenses, all paid for by me." Lockwood also testified that she anticipated it would take four years for her to get her landscape design business functional and that taking care of her children and their family home took significant resources. Thus, the court was presented with evidence of Lockwood's need and time necessary for her to begin earning an income as required by RCW 26.090(1)(a) and (b).

Hall also challenges as unjust and inequitable the amount of maintenance the trial court ordered—$10,000 per month for two years and $8,000 per month for three years. In particular, he challenges various findings of fact that the trial court made in support of its maintenance award, including the court's findings as to his gross monthly income, Lockwood's ability to earn income, and the impact of Lockwood's disability.

As to Hall's income, he contends that the trial court found that he had a gross monthly income of $31,794 but failed to consider that a significant portion of this included Restricted Stock Units (RSUs). He asserts that the trial court's award exceeds and exhausts his take home pay of $8,000 per month and forces him to rely on his retirement funds to pay his own monthly expenses—in other words, that the maintenance award places Lockwood in a better financial position than him every month.

In 2022, Hall's W-2 from Google listed his gross wages as $410,835 and his taxable wages as $378,774. And at trial, Hall testified that his take home pay was $8,000 per month, not including his RSUs. While Hall focuses on his "take home pay," RCW 26.09.090(f) merely requires the trial court to evaluate the ability of the party from whom maintenance is sought to pay their own needs and the needs of the spouse seeking maintenance. A trial court may properly consider "unvested stocks… when determining [ ] ability to pay maintenance." In re Marriage of Condie, 15 Wn. App. 2d 449, 468-69, 475 P.3d 993 (2020). Further, in the child support context, Washington courts have held that regardless of whether they are liquidated, when RSUs are vested, they become taxable income that must be included in the child support calculation. In re E.J.S., 16 Wn. App. 2d 776, 778, 483 P.3d 110 (2021) (defining a RSU as "a form of equity-based compensation consisting of contractual promises by an employer to deliver shares of stock at a future date once the RSUs have vested").[22] Thus, here, the trial court properly considered Hall's RSUs to determine his ability to pay both Lockwood's and his own expenses. Further, while the trial court's award of $10,000 in spousal maintenance for two years and $8,000 for three years is more than Hall's proposed $7,000, it is significantly less than Lockwood's request of $16,000 for four years with yearly reductions for the next five years. The spousal maintenance award furthers the ultimate statutory goal of equalizing the parties.

As to Lockwood's ability to earn income, Hall challenges the trial court's finding that despite her education and work history, she was not readily employable. As

---

[22] However, stock options are property and not income. In re Marriage of Langham & Kolde, 153 Wn.2d 553, 564, 106 P.3d 212 (2005). A stock option is defined as the option for "a corporate employee to buy shares of corporate stock at a fixed price." Black's Law Dictionary (12th ed. 2024).

evidence of Lockwood's ability to earn income, Hall points to the trial court's findings that Lockwood had an Ivy League education and received a Juris Doctor from the University of Washington as well as the finding that Lockwood had worked as a "financial planner" and then "had a solo [legal] practice focusing primarily on estates before closing her office in 2018 to focus on raising [M.H.] and [L.H.]." However, he takes issue with the court's finding that while working as an attorney, Lockwood "made little money grossing less than $30,000 in 2017," as it fails to account for the fact that she was working only part-time in 2017 and had the potential to make more money. Thus, he contends that a person with experience as a lawyer or financial advisor could conceivably earn $4,000 per month. Hall claims the court inappropriately relied on the fact that Lockwood let her bar membership lapse and no longer wants to work as a lawyer or financial advisor to find that she will not be able to earn income for a significant period, because she still has useful skills and experience.

However, the trial court ultimately found that she "is currently unemployable as an attorney" because "she is currently not a member of the bar, and she has childcare responsibilities with two special needs children." The court also found that Lockwood "will need assistance to get back on a career track, as she been out of the work world since 2018 and will be pursuing a new line of work," that would yield "reasonable income in approximately four years." Further, the court found that spousal maintenance would be necessary to "allow Ms. Lockwood and the children to maintain the standard of living of the marriage." At trial, Lockwood testified that as a financial advisor in 2007 she made at most $48,000 per year and as a lawyer in 2017 she made at most $19,600 per year. Aside from letting her bar membership lapse, Lockwood testified that since

leaving her job as a financial advisor she has not kept up with that field and would have to "take tests" and "be sponsored." Further, the court heard testimony that Lockwood had not worked in the previous four years. Additionally, Lockwood explained her plan to return to school to obtain a degree in horticulture so that she could open a landscape design business and proposed it would take her approximately four years to do so. Therefore, the trial court properly considered Lockwood's financial resources and her ability to find employment, as well as the standard of living during the marriage.

Finally, as to the impact of Lockwood's disability, Hall argues that the court's finding that "peripheral neuropathy was a potential basis for Ms. Lockwood's pain [but that] no evidence was presented with a specific, confirmed diagnosis of a condition that constitutes a disability," is at odds with its additional finding that "she is not currently capable of earning $4,000 per month." He also points to the court's finding that Lockwood's symptoms include hand numbness, which prevents her from typing on a keyboard, and leg pain, which made it difficult for her to walk around the block, but that she desires to open a landscape design business, which is a physical job that she must first take classes for. In particular, he takes issue with the fact that the court found that "occasional disabling health issues [ ] impact her ability to work in some areas" but that she would be able to "earn a reasonable income in approximately four-years" as a landscape designer when she currently has significant experience as a lawyer and financial advisor and has previously used tools to accommodate her symptoms in those fields.

However, as Lockwood contends, the trial court found that her medical records "indicate that peripheral neuropathy was a potential basis for Ms. Lockwood's pain and

limitation" and that despite the lack of a "confirmed diagnosis of a condition that constitutes a disability," she nevertheless suffered from "occasional disabling health issues that impact her ability to work in some areas and that she is not currently capable of earning $4,000 per month." Lockwood's patient files indicate she has an "polyneuropathy, unspecified," with notes indicating "peripheral neuropathy" and "hand numbness." At trial, Lockwood described her symptoms as chronic "numbness, coldness, [and] pain" and that it was difficult to get through law school and impacted her work, which required typing and drafting. Further, she noted that stress exacerbated her symptoms and that her separation from Hall reduced her stress and subsequently some of her symptoms. Lockwood also testified that her new career path would not require significant computer work and the nature of the work—being outside—is therapeutic for her symptoms. Thus, the record supports that the trial court adequately considered Lockwood's physical and emotional condition as well as her style of life amidst her "occasional[ly] disabling health issues."

We conclude that the trial court appropriately considered all of the relevant statutory factors in making its spousal maintenance award and acted within its discretion. Given that Hall initially proposed a maintenance term of four years and Lockwood anticipates earning an income in four years, the evidence substantially supports the trial court's findings as to maintenance.

Finally, Hall asserts that considering the spousal maintenance and property distribution awards together, they are unjust and inequitable. In support of his argument that the awards are inequitable, he cites to Condie, 15 Wn. App. 2d at 470-72 and In re Marriage of Rink, 18 Wn. App. 549, 552-53, 571 P.2d 210 (1977), for the proposition

that when determining whether to administer maintenance, the court is required to consider the property distribution. However, he provides no additional argument to suggest either that the trial court did not contemplate the property division award when considering its maintenance award, or that it failed to contemplate maintenance in its property division award. Rather, he reiterates his claims that the property distribution and spousal maintenance were unjust and inequitable.[23]

Here, the trial court found that the division of real property was "designed to provide financial and location security for Ms. Lockwood and the children," and concluded that its real property, community personal property, and separate personal property distributions were "fair (just and equitable)." Further, it addressed the relevant statutory factors and entered findings in support of those factors and concluded that spousal maintenance at $10,000 per month for two years and $8,000 per month for three years was appropriate. Therefore, we conclude that the trial court considered its property division award when contemplating maintenance and acted within its discretion. The trial court did not abuse its broad discretion including that the maintenance and property distribution awards, viewed together on the record before us, are just and equitable.

III.  Attorney Fees

Lockwood seeks appellate attorney fees pursuant to RAP 18.1. A party may request attorney fees on appeal "if applicable law grants" such recovery. RAP 18.1(a). The party requesting appellate fees must also argue and cite to authority "to advise the

---

[23] For example, he contends that the property distribution was skewed in Lockwood's favor because she was awarded the majority of the community property, the family home, some of Hall's separate property, and credited some of the children's college savings accounts.

court of the appropriate grounds for an award of attorney fees as costs." Stiles v. Kearney, 168 Wn. App. 250, 267, 277 P.3d 9 (2012). A prevailing party[24] is entitled to appellate attorney fees when " 'there is a contract, statute, or recognized ground in equity,' " that provides for such award. Umpqua Bank v. Shasta Apts., LLC., 194 Wn. App. 685, 699, 378 P.3d 585 (2016) (quoting Thompson v. Lennox, 151 Wn. App. 479, 491, 212 P.3d 597 (2009)).

As a basis for an award of appellate attorney fees, Lockwood cites to RCW 26.09.140. Under RCW 26.09.140, "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs" after considering the financial resources of both parties. Here, each party timely filed an affidavit of financial need. As the affidavits reflect a continued disparity in income, Lockwood's inability to pay due to much of her assets being in real property, and Hall's ability to pay, we award fees on appeal to Lockwood, subject to compliance with the procedural requirements of RAP 18.1(d).

Because both parties have prevailed in part on this appeal, neither party has substantially prevailed as required by RAP 14.1 and 14.2. Therefore, we decline to award costs to either party.

---

[24] A prevailing party or a substantially prevailing party is one that "receives judgment in its favor at the conclusion of the entire case." Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 739-40, 253 P.3d 101 (2011).

CONCLUSION

We reverse the trial court's order on the limited issue of crediting payments from the children's college savings accounts to the parent whose family contributed to the respective accounts and remand to the trial court to remove this language. We otherwise affirm the trial court's division of property and award of spousal maintenance and award Lockwood appellate attorney fees.

_Chung, J._

WE CONCUR:

_Feldman, J._      _Díaz, J._